[No. B170079. Second Dist., Div. Two. Jan. 19, 2006.]

FULLER-AUSTIN INSULATION COMPANY, Plaintiff and Respondent, v. HIGHLANDS INSURANCE COMPANY et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

964

COUNSEL

Alschuler Grossman Stein & Kahan, Frank Kaplan, Kenneth S. Meyers; Spepanik Cortner McNaboe Colliau & Jordan and Michael T. Colliau for Defendants and Appellants Transcontinental Insurance Company and Columbia Casualty Company.

Hogan & Hartson, Kenneth D. Klein, David R. Singer, William J. Bowman, James P. Ruggeri, Catherine E. Stetson; Wilmer Cutler Pickering Hale and Dorr, Seth P. Waxman, Jonathan E. Nuechterlein, Craig T. Goldblatt and Todd Zubler for Defendants and Appellants First State Insurance Company, New England Reinsurance Corp. and Twin City Fire Insurance Company.

Berkes Crane Robinson & Seal, Steven M. Crane, Barbara S. Hodous; Munger, Tolles & Olson, Ronald L. Olson, Kelly M. Klaus, Paul J. Watford, Sarah E. Kurtin and Grant A. Davis-Denny for Defendant and Appellant Stonewall Insurance Company.

Hancock Rothert & Bunshoft, Patrick A. Cathcart, William J. Baron; Wachtell, Lipton, Rosen & Katz, Michael W. Schwartz, Douglas K. Mayer, William Savitt; Greines, Martin, Stein & Richland, Irving H. Greines, Robert A. Olson and Peter O. Israel for Defendants and Appellants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies.

Nancy F. Peters; Thomas C. Sanford & Associates and Thomas C. Sanford for Defendants and Appellants Tenecom Insurance Company (f/k/a Yasuda Fire & Marine Insurance Company (UK) Ltd.) and Winterthur Swiss Insurance Company.

Sonnenschein Nath & Rosenthal and Ronald D. Kent for Defendant and Appellant International Insurance Company.

Wiley Rein & Fielding, Laura A. Foggan, Karalee C. Morell; Sinnott, Dito, Moura & Puebla and John J. Moura, Counsel for Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Defendants and Appellants.

Morgan, Lewis & Bockius, Michel Y. Horton, Thomas M. Peterson, Jason B. Komorsky, Laura R. Ramos; Anderson Kill & Olick, Robert M. Horkovich, Rhonda D. Orin and Robert Y. Chung for Plaintiff and Respondent.

OPINION

**DOI TODD, J.**—Appellants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (collectively LMI); Stonewall Insurance Company (Stonewall); Transcontinental Insurance Company and Columbia Casualty Company (collectively CNA); First State Insurance Company, New England Reinsurance Corp., and Twin City Fire Insurance Company (collectively First State); and International Insurance Company (International) appeal from a judgment entered in favor of respondent Fuller-Austin Insulation Company (Fuller-Austin) following a phased bench and jury trial.

This action raises the issue of the effect of an insured's bankruptcy under title 11 United States Code section 524(g) on an excess insurer's obligations. Fuller-Austin utilized the unique provisions of that statute to resolve its liability for present and future asbestos claims. The trial court ruled that those bankruptcy proceedings not only conclusively determined Fuller-Austin's liability but also provided a mechanism for determining the aggregate value of that liability for the purposes of indemnification. Thereafter, a jury calculated and found appellants liable for a fixed sum that constituted the amount of Fuller-Austin's aggregate liability to present and future asbestos claimants.

Though the judgment comports with the goals of title 11 United States Code section 524(g) to ensure that all asbestos claimants are treated fairly and—to the extent possible—equally, it is inconsistent with the parties' contractual rights and obligations under their insurance policies. Accordingly, significant portions of both the trial court's statement of decision and the special verdict must be reversed. The bankruptcy confirmation proceedings were not an actual trial of Fuller-Austin's liability triggering appellants' indemnification obligations. Moreover, estimations of the individual and aggregate value of present and future asbestos claims served neither to affix nor to accelerate appellants' indemnification obligations, and did not provide a basis for coverage of those claims to be presumed. Rather, the bankruptcy confirmation constituted a settlement of Fuller-Austin's liability, the effect of which was subject to challenge by appellants. While we do not intend to undo the efficiencies afforded by title 11 United States Code section 524(g), we cannot conclude that the statute was intended to eradicate appellants' rights under their insurance policies.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Parties and the Insurance Policies.*

From the mid-1940's to the mid-1980's, Fuller-Austin was involved in the installation and removal of building materials containing asbestos. In 1974,

DynCorp acquired Fuller-Austin, which continued to operate as a subsidiary until it ceased operations in 1987.

Several insurance companies, including appellants, issued excess insurance policies to Fuller-Austin or DynCorp that covered periods during which Fuller-Austin was in operation.[1] Five sets of policies are at issue in this appeal. LMI issued two categories of excess liability insurance comprised of five "London General" policies and four "Cities Service" policies covering the period from January 1966 to June 1971. Stonewall issued two excess policies covering the period from January 1973 to December 1975. CNA issued five excess or umbrella policies covering the periods from February 1977 to February 1978 and July 1981 to July 1985. First State issued three excess policies covering the period from February 1977 to February 1978 and July 1983 to July 1984. International issued one excess policy covering the period from July 1980 to July 1981.

The excess policies generally "follow form"; this means that they incorporate the provisions of the immediately underlying policies. Each of the excess policies incorporates substantially similar "loss payable provisions" that provide the excess insurer has no obligation to indemnify the insured until "after the Insured's liability shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or by written agreement of the Insured, the claimant, and the Company." The excess policies allow but do not require appellants to defend Fuller-Austin against a claim. They similarly allow but do not require appellants to participate in the investigation, settlement or defense of any claim.

B. *Fuller-Austin's Coverage Action.*

About the same time that Fuller-Austin discontinued operations in the late 1980's, it began to face thousands of personal injury complaints filed by individuals claiming to have been injured by exposure to its asbestos materials. Fuller-Austin tendered those claims to its primary general liability insurers; they defended Fuller-Austin until it filed for bankruptcy in 1998.

In the early 1990's, the number of complaints began to escalate dramatically. In March 1993, Fuller-Austin sent letters to its excess insurance carriers

---

[1] An excess insurance policy serves a different purpose than a primary policy. Whereas primary coverage generally provides immediate coverage upon the occurrence of a loss or event giving rise to liability, " '[e]xcess insurance provides coverage after other identified insurance is no longer on the risk. "Excess" coverage means "coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." ' [Citation.]" *(Pacific Indemnity Co. v. Bellefonte Ins. Co.* (2000) 80 Cal.App.4th 1226, 1235 [95 Cal.Rptr.2d 911], italics omitted.) We discuss only those excess policies issued by appellants.

stating: "The insurers who provided primary general liability coverage have agreed to defend the claims brought against DynCorp. At this point, we are providing you with notice of those underlying claims because it appears possible that excess general liability coverage may be implicated by these or future claims upon exhaustion of the primary limits." In response, Stonewall issued a reservation of rights letter indicating that it did not have enough information to determine whether there was coverage for the asserted losses and setting forth several possible bases under which coverage could be denied. Other insurers responded with letters requesting additional information.

In November 1994, Fuller-Austin filed the instant coverage action against approximately 20 excess insurers, seeking to establish coverage for past, present and future asbestos bodily injury claims under multiple general liability, excess and umbrella policies.

## C. *Fuller-Austin's Bankruptcy.*

### 1. *Prebankruptcy negotiations.*

In 1997, while the coverage action was pending, DynCorp and Fuller-Austin began to explore the possibility of Fuller-Austin's filing for bankruptcy in accordance with title 11 United States Code section 524(g) (section 524(g)). Enacted in 1994, section 524(g) addresses the unique bankruptcy-related problems that arise in the context of asbestos mass tort litigation. The statute provides a mechanism by which an entity can transfer its assets to a trust, which is then responsible for paying asbestos claimants over time. (See 11 U.S.C. § 524(g)(2)(B).) This procedure is intended to enhance the likelihood that present and future claimants will be treated equally. Once a bankruptcy plan is confirmed under section 524(g), a permanent injunction is issued barring any further asbestos-related lawsuits against the debtor, and present and future claimants must seek compensation for their asbestos-related injuries from the trust alone. (See 11 U.S.C. § 524(g)(1).)

On October 2, 1997, Fuller-Austin invited attorneys representing asbestos claimants to a meeting scheduled on October 21, 1997. The purpose of the meeting was to explore the possibility of filing a "prepackaged" bankruptcy plan, which would require Fuller-Austin and at least 75 percent of its creditors to reach agreement on the terms of a proposed bankruptcy plan before jointly seeking court approval.[2] (See 11 U.S.C. § 524(g)(2)(B)(ii)(V).) On October 17, 1997, Fuller-Austin notified appellants of the meeting. The letter invited them to "participat[e] in this settlement process in an appropriate

---

[2] Fuller-Austin's only creditors were asbestos claimants.

manner" subject to the execution of a confidentiality agreement, but expressly conditioned any involvement beyond participation: "Fuller's insurance companies have the option of directing Fuller not to engage in such negotiations or settlements, however, Fuller will accept such a direction only if accompanied by written binding commitments wherein all insurers accept tender of asbestos claim defense and asbestos claim indemnity without a reservation of rights." Representatives from two of the excess insurance companies attended the meeting.

Fuller-Austin and asbestos claimant representatives thereafter continued to negotiate, and in June 1998, they documented their agreement in the form of a bankruptcy plan (Plan) and disclosure statement. In August 1998, Fuller-Austin received approval of the Plan from 75 percent of the asbestos claimants. Though appellants knew about the negotiations, Fuller-Austin neither sought nor obtained approval of the Plan from appellants.

## 2. *Bankruptcy confirmation proceedings.*

On September 4, 1998, Fuller-Austin filed for chapter 11 bankruptcy protection in the Delaware federal district court, seeking confirmation of the Plan prepared in accordance with section 524(g). In conjunction with the Plan, Fuller-Austin filed a disclosure statement setting forth the factual bases for the Plan. Appellants received the Plan and disclosure statement approximately two weeks after the filing.

The Plan provided for the creation of the "Fuller-Austin Settlement Trust" (the Trust) in accordance with section 524(g). The Trust assumed Fuller-Austin's liability for all present and future asbestos claims, and Fuller-Austin and DynCorp received a full release and injunction barring any further litigation against them concerning present or future asbestos claims. In return, DynCorp contributed approximately $14 million in cash and other assets to the Trust, and Fuller-Austin contributed its insurance policies as well as its continued prosecution of this coverage action on behalf of the Trust.

The Plan created claims resolution procedures (CRP) that set forth the procedural mechanisms by which the Trust would resolve claims alleging asbestos injuries. The CRP created no "substantive right for any claimant." According to the CRP, the Trust must determine whether to allow or disallow a claim at the time it is submitted. In general, the CRP provided that the Trust would allow a claim if the claimant demonstrated that he or she suffered from an asbestos-related illness or injury and had worked anywhere at a project site during or after Fuller-Austin's handling of asbestos-containing material at the site. If allowed, a claim would then be assigned a predetermined "allowed liquidated value" (ALV) corresponding to one of five asbestos-related disease

categories. The claimant could either accept the Trust's determination or seek a different ruling through binding or nonbinding arbitration, or a jury trial. In view of the Trust's limited resources, however, the CRP expressly provided that a claimant would receive only a periodically adjusted "Payment Sum Percentage" of the ALV, based on the Trust's assets, that would amount to only a fraction of the ALV.

As originally proposed, the CRP also contained language mirroring the excess insurance policies' indemnification provisions. Specifically, the Plan required the bankruptcy court to determine an aggregate amount of Fuller-Austin's total asbestos liabilities to present and future claimants, and provided that the Plan's confirmation would constitute "an adjudication of liability on the part of Fuller-Austin and the Trust for the Allowed Aggregate Asbestos Claim and to holders of Asbestos Claims, and shall be a determination of a sum that Fuller-Austin and the Trust shall be legally obligated to pay."

Asserting that this provision was an attempt to adjudicate the issues raised by the coverage litigation, appellants filed objections to the Plan and sought to intervene in the bankruptcy proceedings. As summarized by the bankruptcy court, appellants "object[ed] to the confirmation of the Plan and approval of the Disclosure Statement on the grounds that confirmation of the proposed Plan would 'summarily adjudicate the liability of excess carriers under excess insurance policies,' thus impacting and possibly influencing the resolution of the pending Coverage Litigation and impairing the rights and obligations of [appellants] under their insurance policies." Appellants also challenged the Plan's criteria for proof of exposure to asbestos and disease category valuations.

As a result of appellants' objections, Fuller-Austin unilaterally deleted the challenged language concerning any aggregate amount it would be legally obligated to pay and added a new provision that stated: "12.9.1 Maintenance of the Coverage Litigation. Notwithstanding any other provision in this Plan, all claims and defenses of any Asbestos Insurance Company that is a party to the Coverage Litigation shall be adjudicated in the Coverage Litigation, and all rights of the Asbestos Insurance Companies under the Asbestos Insurance Policies shall remain unaffected by the Plan and the Confirmation Order."

On October 15, 1998, the bankruptcy court held the confirmation hearing and heard argument concerning appellants' standing to intervene in the bankruptcy proceedings. First, the court proceeded with Fuller-Austin's presentation of evidence in support of the disclosure statement and the proposed Plan, allotting Fuller-Austin one hour with no cross-examination. Two witnesses testified—a law professor who helped prepare the prepackaged Plan on

Fuller-Austin's behalf, and a valuation consultant who helped Fuller-Austin to estimate the number, cost and timing of future asbestos claims and to develop the CRP. Fuller-Austin also submitted eight affidavits from seven individuals (including the two who testified) who assisted in the negotiations and supported the Plan.

Second, the bankruptcy court heard argument concerning appellants' standing to intervene. In view of its modification to the Plan, Fuller-Austin represented: "Our view is that these carriers simply do not have any interest as affected by this plan of reorganization. The interests of the carriers in Fuller-Austin arise through a contract between Fuller-Austin and the carriers, a contract of insurance. What we have done, to make it clear, to the extent there is any doubt, is we have, in 12.9.1, said that all of their rights under those policies are unaffected by the plan of reorganization. [¶] Further, we all understand there is coverage litigation pending in California. We have tried to make clear, to the extent that that first proposition isn't sufficient, that these proceedings have absolutely no impact on the proceedings in California in terms of the claims and defenses that those carriers have raised and are litigating in California. [¶] . . . [¶] I think we have made perfectly clear in our amendment to the plan of reorganization that [the carriers'] rights are not affected, and we have made perfectly clear in our amended plan that their claims and defenses in the coverage litigation is [*sic*] not affected."

On November 10, 1998, the bankruptcy court issued an order finding that appellants lacked standing to appear in the bankruptcy proceedings and overruling their objections to the Plan. It concluded that appellants were "not 'directly and pecuniarily affected' by the proposed Plan" because their rights under the insurance policies were preserved for adjudication in the coverage litigation. Thereafter, on November 13, 1998, the bankruptcy court issued findings of fact and conclusions of law, and confirmed the Plan. The confirmation order restated section 12.9.1 of the Plan, providing that appellants' rights under their policies were to remain unaffected by the Plan. The Plan became effective on December 11, 1998.

D. *The Coverage Action Trial and Judgment.*

Following Plan confirmation, Fuller-Austin resumed the coverage litigation.[3] In the operative fifth amended complaint, Fuller-Austin alleged claims for declaratory relief, breach of contract and bad faith. Claims against many insurers were resolved by way of motion or settlement. In 2000, the trial court bifurcated the trial against the remaining insurers into a phase IA and IB bench trial and a phase II jury trial.

---

[3] "Fuller-Austin" generally refers to the Trust, which became the party prosecuting the coverage action.

In phase IA, tried between December 4 and December 18, 2000, the trial court resolved two legal issues by way of a statement of decision issued on July 20, 2001. First, it determined that the excess policies generally "follow[] form," which means that they incorporate the terms and conditions of their underlying policies. Second, it found that horizontal rather than vertical exhaustion applied to determine the point at which an excess policy would be on the risk. The court concluded "that all of Fuller-Austin's applicable primary policies must be exhausted before any excess policy attaches." Appellants do not challenge either of the phase IA rulings.

The trial court conducted the phase IB bench trial between September and December 2001, and issued its initial statement of decision on February 26, 2002, and a revised statement of decision on August 6, 2002. In phase IB, Fuller-Austin adopted a position it did not take in the bankruptcy proceedings; it asserted that its confirmed Plan was a final adjudication that established its liability to asbestos claimants and therefore obligated appellants to pay the full ALV established by the bankruptcy court with respect to each asbestos claim.

The trial court agreed with Fuller-Austin's new position, ruling that "Fuller-Austin's confirmed bankruptcy plan is a binding federal court judgment and adjudication that establishes Fuller-Austin's liability and its legal obligations to pay damages to all pending and future asbestos claimants." It found that the bankruptcy proceedings constituted an "actual trial" of Fuller-Austin's liability; alternatively, it reasoned that the Plan constituted a "settlement" for which appellants' consent was unnecessary because appellants had received notice of and an opportunity to participate in the bankruptcy proceedings. In connection with these findings, the trial court further ruled that appellants' "insuring obligations were triggered by knowledge of asbestos liabilities potentially exceeding their attachment points and by Fuller-Austin's request that excess insurance companies participate in the handling and settling of the asbestos lawsuits," and that appellants "are obligated to pay the full allowed amount established by the federal court with respect to each asbestos claim, notwithstanding the fact that Fuller-Austin will only be able to pay a percentage of these values because of its bankrupt status." With respect to the issues remaining for phase II, the trial court ruled that "[t]he asbestos liabilities adjudicated in the bankruptcy are presumed to be harm within coverage" and "[i]t is [appellants'] burden at trial to prove otherwise," and that "[t]he determination of the 'aggregate value' of Fuller-Austin's liabilities to pending and future asbestos claimants—i.e., the dollar amount of the bankruptcy court judgment against Fuller-Austin—will be determined in the jury phase of this case, based on expert testimony and statistical evidence, as is typical in assessing damages in contract or tort disputes."

With respect to the other legal issues adjudicated in phase IB, the trial court adopted a continuous trigger of coverage, ruling that all policies in effect from the date of first asbestos exposure until the date of death or claim are triggered by an asbestos bodily injury claim. It further ruled that the excess insurers could not apportion any loss to an insolvent period at a lower coverage level; that the excess insurers were not required to drop down to respond to losses below their policies' stated attachment points; that the excess insurers' obligations to pay were triggered by Fuller-Austin's legal obligation to pay losses—not its actual payment thereof; and that insurance policies issued by settled and dismissed insurance companies were deemed exhausted as a matter of law.

In September 2002, we summarily denied First State's petition for writ of mandate challenging the trial court's phase IB rulings. (*First State Ins. Co. v. Superior Court* (Sept. 25, 2002, B160737) [summary denial by order].) Before commencement of the phase II jury trial, appellants CNA, First State and International settled, reserving their right to appeal the two legal issues of whether they were obligated to provide coverage to Fuller-Austin on the basis of an estimation of the value of present asbestos claims and future demands, and whether they were obligated to indemnify Fuller-Austin for the ALV or the payment percentage received by each claimant.

Phase II began in February 2003 against LMI, Stonewall and Highlands Insurance Company (Highlands). The jury's task was to ascertain the scope of Fuller-Austin's present and future asbestos liabilities and to determine the obligations of the individual insurers with respect to those liabilities. The trial court instructed the jury on the basis of its phase IB rulings. Significant instructions included that "[t]he confirmed bankruptcy plan established Fuller-Austin's liability for asbestos-related injuries, the amount of damages to which each asbestos victim is legally entitled, and the procedure for satisfying the liability"; "the asbestos bodily injury claims resolved in the bankruptcy proceedings are presumed to be harm within the coverage provided by the insurance policies issued by the insurance companies in this action"; the bankruptcy court determined that the damage amounts set forth in the Plan were reasonable; and "[e]ven if an excess insurance company has not denied coverage or refused to defend, the insurance company has a duty to accept a reasonable settlement of covered claims . . . ."

In May 2003, the jury returned a 22-question special verdict, finding: With the exception of LMI under the Cities Service policies, no insurer breached its insurance policy before confirmation of the Plan; with the exception of Stonewall under one of its policies, all insurers breached their insurance policies after Plan confirmation, causing damage to Fuller-Austin;

Fuller-Austin did not fail to cooperate with the insurers or to mitigate damages; the Plan was not the product of collusion or unclean hands; and the value of Fuller-Austin's allowed asbestos claims was $108,175,000, the value of pending but unresolved claims was $108 million and the value of future claims was $750 million. The jury allocated specific dollar amounts to both time periods and policies for present and future asbestos liability. The jury also resolved other issues specific to the Stonewall and LMI Cities Service policies.

After apportioning the jury's award among multiple insurance policies, the trial court entered judgment on August 1, 2003. It denied motions for a new trial and judgment notwithstanding the verdict on September 18, 2003. It also awarded certain costs to Fuller-Austin.

All appellants timely appealed from the judgment; Stonewall and LMI also appealed from the postjudgment orders.[4] Fuller-Austin filed a notice of cross-appeal from the judgment, but we dismissed its cross-appeal after it failed to file an opening brief. We consolidated the matter for briefing and decision.

## DISCUSSION

Appellants' claims may be classified into three general categories. First, appellants contend that the phase IB rulings are legally insupportable. Specifically, they contend that the bankruptcy confirmation of the Plan did not trigger their indemnity obligations because it was neither an actual trial of Fuller-Austin's liability nor a settlement with their consent; that a jury's estimate of Fuller-Austin's present and future claims obligation cannot trigger their indemnity obligations because such an estimate is not an award of damages in a fixed amount; and that they cannot be required to indemnify Fuller-Austin in the amount of the ALV for each claim when—according to the Plan's own terms—Fuller-Austin will pay a lesser amount to each claimant. Second, they contend that the jury instructions erroneously and prejudicially imposed a presumption of coverage for present and future asbestos claims and prevented the jury from determining whether the bankruptcy settlement was reasonable. Finally, appellants LMI and Stonewall contend that legal errors infected and substantial evidence did not support the verdict as it relates to certain specific policies they issued.

■ Resolution of the majority of these claims requires us to reconcile the provisions of section 524(g) with the language of the excess insurance policies. Our goal is to ensure that—to the extent reasonably possible—the

---

[4] Highlands dismissed its appeal in September 2004.

parties have the same rights and duties that they possessed prior to bankruptcy. Because a debtor's property rights are determined by state law, bankruptcy provides "no greater rights in property than those held by the debtor prior to bankruptcy." (*In re Coupon Clearing Service, Inc.* (9th Cir. 1997) 113 F.3d 1091, 1099; see also H.R. Rep. No. 95-595, 1st Sess., reprinted in 1978 U.S. Code Cong. & Admin. News, p. 6323 [bankruptcy "is not intended to expand the debtor's rights against others more than they exist at the commencement of the case"]; *In re Jones* (Bankr. E.D.Pa. 1995) 179 B.R. 450, 455 ["the owner of an insurance policy cannot obtain greater rights to the proceeds of that policy than he would have under state law by merely filing a bankruptcy petition"].) Just as bankruptcy does not enhance Fuller-Austin's rights, nor does it minimize appellants' obligations. (See Ins. Code, § 11580 [insurer is not relieved of its obligations because of insured's bankruptcy or insolvency]; *Haisten v. Grass Valley Medical Reimbursement* (9th Cir. 1986) 784 F.2d 1392, 1403 [Ins. Code, § 11580 is aimed at preventing an insurer from avoiding responsibility for its insured's conduct].)

Keeping these principles in mind, we turn first to provisions of section 524(g) and the courts' application of those provisions to insurers before we address appellants' specific claims.

I. *Overview of Section 524(g) and Its Impact on Insurers.*

█ Section 524(g) is a type of chapter 11 bankruptcy. " 'In amending § 524(g) in 1994, Congress intended to address the unique situation faced by asbestos debtors and their creditors, specifically envisioning that the bankruptcy plan would set aside funds to provide for future claimants.' " (*In re G-I Holdings, Inc.* (Bankr. D.N.J. 2005) 323 B.R. 583, 620.) It is the compromise of future claims that makes section 524(g) unique: Section 524(g) "is a significant departure from typical bankruptcy cases, which compromise claims existing as of the date the bankruptcy petition is filed, but not claims that arise thereafter. [Fn.] In asbestos cases, the creditor body includes not only existing or present claimants, but also a significant number of future claimants: persons who were exposed to asbestos prior to a defendant's bankruptcy filing may not develop asbestos-related injuries until much later. Section 524(g) permits the debtor to protect itself against these 'future' claims. [¶] Section 524(g) is therefore significant because it is the mechanism by which an asbestos defendant may shield itself from liability by diverting not only present, but also future or unknown claimants, to a limited fund for payment." (*From Free-Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankruptcies* (Winter 2004) 12 Am. Bankr. Inst. L.Rev. 441, 444 (*Asbestos Bankruptcies*).)

█ To qualify for the protection afforded by section 524(g), "a court must find that the debtor has been named in an action for damages allegedly caused

by asbestos, that the debtor is likely to be subject to substantial demands for payment in the future arising out of the same or similar conduct, that the amounts and timing of such future claims are uncertain, and that permitting the pursuit of such claims outside the trust mechanism would threaten the plan's attempts to deal equitably with current and future demands. 11 U.S.C. § 524(g)(2)(B)(i)(I), (ii)(I–III)." (*In re Combustion Engineering, Inc.* (3d Cir. 2004) 391 F.3d 190, 234, fn. 45.) A debtor satisfying these criteria may propose a bankruptcy plan that provides for a trust to assume its liabilities for asbestos claims that is funded in whole or in part by the debtor's securities and obligation to make future payments. (11 U.S.C. § 524(g)(2)(B)(i)(I)–(II).) To ensure that both present and future asbestos claimants are treated alike, "the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." (11 U.S.C. § 524(g)(2)(B)(ii)(V).)

To be confirmed, the section 524(g) plan must be approved by 75 percent of the claimants whose claims will be addressed by the trust. (11 U.S.C. § 524(g)(2)(B)(i)(IV)(bb).) If the plan is confirmed, the bankruptcy court issues a "channeling injunction" directing those holding prepetition claims to bring their claims against the trust established by the debtor, rather than against the debtor itself. (11 U.S.C. § 524(g)(2)(A); *In re Quigley Co., Inc.* (S.D.N.Y. 2005) 323 B.R. 70, 78.) Section 524(g) authorizes the issuance of a channeling injunction against a nondebtor third party, including the debtor's insurer, when that third party contributes to the trust.[5] (11 U.S.C. § 524(g)(4)(A)(ii)(III).) Apart from this provision, however, section 524(g) does not address any issues relating to insurance.

The absence of statutory language concerning the impact of a section 524(g) confirmation on the debtor's insurers and insurance policies has begun to lead to litigation concerning insurer challenges to confirmation. (See *Asbestos Bankruptcies, supra*, 12 Am. Bankr. Inst. L.Rev. at p. 446 [noting that Fuller-Austin was one of the first significant entities to negotiate a prepackaged bankruptcy under section 524(g)].) In one case, the parties avoided such a challenge by adding a plan provision that permitted the insurers to participate in the resolution and defense of an asbestos claim at the claim allowance stage in the bankruptcy court. (*In re Celotex Corp.* (Bankr. M.D.Fla. 1996) 204 B.R. 586, 615.) Most published cases to date,

---

[5] For example, several of Fuller-Austin's primary insurers received the benefit of a channeling injunction upon Plan confirmation.

however, sanction section 524(g) bankruptcy plans that expressly permit insurers to retain their policy rights under state law.

For example, in *In re Combustion Engineering, Inc., supra,* 391 F.3d 190, the bankruptcy plan provided "that nothing in the Plan 'shall in anyway [*sic*] operate to, or have the effect of, impairing insurers' legal, equitable or contractual rights, if any, in any respect.' " (*Id.* at p. 217.) Holding that the insurers did not have standing to challenge plan confirmation, the court concluded that this language demonstrated that the plan did not diminish the insurers' rights or increase their burdens under the subject insurance policies and settlements, as the insurers retained their prepetition rights to dispute coverage and raise claims and defenses to payment. (*Id.* at pp. 217–218.) In *In re Western Asbestos Co.* (Bankr. N.D.Cal. 2004) 313 B.R. 456, the bankruptcy court confirmed a plan with similar language; the plan provided that the debtors' insurance policy rights would vest in a trust and that "such vesting of Insurance Rights shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies against a party that is not a Released Party. Neither shall the vesting of the Insurance Rights in the Trust expand those rights."[6] (*In re Western Asbestos Co., supra,* 313 B.R. at p. 462.)

Similar to the foregoing bankruptcy plans, the plan in *In re Mid-Valley, Inc.* (Bankr. W.D.Pa. 2004) 305 B.R. 425 provided that it would " 'neither diminish nor impair the rights of a party under any Asbestos/Silica Insurance Policy or the rights, if any, of any Asbestos/Silica Insurance Company to assert any claim, defense, or counterclaim in connection therewith.' " (*Id.* at p. 428.) Explaining that the insurers lacked standing to challenge the plan because they retained all their rights under their policies, the court stated: "The fact that Debtors agreed to pay more to asbestos claimants to settle their liabilities than the certain insurers think Debtors should have agreed to does not create an injury to the certain insurers. The insurers retain rights to dispute whatever they may be asked to pay in future proceedings. Moreover, Debtors' agreement with asbestos claimants to a limit of liability does not bind the certain insurers to pay that same amount. The certain insurers can raise challenges at the appropriate time and place. The insurers' liability under their policies is untouched." (*Id.* at p. 432; see also *In re A.P.I., Inc.* (Bankr. D.Minn. 2005) 331 B.R. 828, 842 [insurers lacked standing to challenge plan where it expressly preserved their state law rights, providing that it did not affect " 'the right of any Asbestos Insurance Companies under any Asbestos In-Place Coverage' " and that all insurers " 'shall be deemed to have reserved all rights . . . to contest or defend any claims against them on the merits of such

---

[6] This language appears to have addressed the insurers' prior objection that the plan modified their state law contractual policy rights and refuted the debtors' response that section 524(g) preempted the insurers' rights under state law. (See *In re Western Asbestos Co.* (Bankr. N.D.Cal. 2003) 313 B.R. 832, 856–857.)

claim to the extent permitted under applicable non-bankruptcy law' "]; compare *Baron & Budd, P.C. v. Unsecured Asbestos Claimants* (D.N.J. 2005) 321 B.R. 147, 157–162 [insurers held to have standing to challenge section 524(g) plan confirmation where the trust was funded primarily through insurance proceeds and plan language concerning the impact on insurers remained in flux].)

One would expect the logical consequence of the foregoing bankruptcy plan language to be state law coverage actions involving asbestos claims. But we have not located—nor have the parties cited—any case in the state courts resolving the state law issues left open by a section 524(g) bankruptcy plan that expressly provides it does not affect the debtor's and insurer's policy rights. We therefore turn to the first impression issues raised by the coverage action here.

II. *The Phase IB Statement of Decision.*

A. *Standard of Review and Rules of Policy Interpretation.*

■ Appellants challenge the trial court's interpretation of their insurance policies as they relate to the bankruptcy confirmation under section 524(g). The interpretation of an insurance policy is a question of law which we review de novo. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Safeco Ins. Co. of America v. Parks* (2004) 122 Cal.App.4th 779, 789 [19 Cal.Rptr.3d 17]; *Hendrickson v. Zurich American Ins. Co.* (1999) 72 Cal.App.4th 1084, 1089 [85 Cal.Rptr.2d 622].) But "to the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts, an appellate court will review such factual findings under a substantial evidence standard." (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 [117 Cal.Rptr.2d 631].)

In general, we interpret insurance policies using rules of contract interpretation. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) In *Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568], the court summarized those rules: " 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citation.] Thus, 'the mutual intention of the parties at the time the contract is formed governs interpretation.' [Citation.] If possible, we infer this intent solely from the written provisions of the insurance policy. [Citation.] If the policy language 'is clear and explicit, it governs.' [Citation.] [¶] When interpreting a policy provision, we must give its terms their ' "ordinary and popular sense," unless "used by the parties in a technical sense or a special

meaning is given to them by usage." ' [Citation.] We must also interpret these terms 'in context' [citation], and give effect 'to every part' of the policy with 'each clause helping to interpret the other.' [Citations.]" (Accord, *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

### B. *The Effect of the Bankruptcy Court's Confirmation of the Plan.*

The focus of the trial court's statement of decision in phase IB was the impact of the bankruptcy court's section 524(g) Plan confirmation on appellants' indemnity obligations. In general, those obligations arise from the policies' "loss payable" provisions, which appear in each of the excess policies in substantially similar language. Those provisions generally provide that the excess insurer has no obligation to indemnify the insured until "after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and [insurer]."

Finding that the bankruptcy confirmation satisfied the "actual trial" requirement of the loss payable provision, the trial court stated: "[T]he Court concludes that the confirmed Bankruptcy Plan ('Plan') served to establish Fuller-Austin's liability for asbestos-related injuries, the quantum of damages to which each asbestos victim is legally entitled, and the procedure for satisfying the liability. . . ." "The policies pay legal obligations after adjudication or compromise (*i.e.*, settlement). The confirmation of the plan of reorganization is, as a matter of law, a judgment. . . . [¶] . . . [¶] . . . [and] the bankruptcy adjudication satisfies the two components of an 'actual trial': '(1) an independent adjudication of facts based on an evidentiary showing; and (2) a process that does not create the potential for fraud and abuse.' [Citations.]" The trial court found that the bankruptcy court's independent review of the Plan and specific findings confirming the Plan constituted an actual trial within the meaning of the policies.

### 1. *Plan confirmation was not an actual trial.*

The trial court's finding that the confirmation proceedings amounted to an actual trial is contrary to California law. In *Wolkowitz v. Redland Ins. Co.* (2003) 112 Cal.App.4th 154 [5 Cal.Rptr.3d 95] (*Wolkowitz*), this district held that a bankruptcy court order allowing a claim against an insured did not constitute a judicial finding that the insured was liable in the claimed amount. (*Id.* at p. 166.) In *Wolkowitz*, the insured's bankruptcy trustee and the claimant reached an agreement as to the amount of the claim. At a hearing, the bankruptcy court granted the trustee's unopposed motion to approve the agreement and allow the claim. (*Id.* at p. 159.) The trustee then filed an action

for breach of contract against Redland, the insurer, alleging "that the bankruptcy court's allowance of [the] claim constituted a 'final judgment' against [the insured] and that Redland is liable to the trustee in that amount." (*Ibid.*)

Affirming the trial court's sustaining of Redland's demurrer, the appellate court reasoned that "a bankruptcy court allowance of a claim does not provide sufficient assurance that a stipulated claim, approved without objection and *without a contested evidentiary hearing*, will accurately or reliably reflect the debtor's actual liability on the claim." (*Wolkowitz, supra,* 112 Cal.App.4th at p. 166.) The *Wolkowitz* court analogized these circumstances to those in *Hamilton v. Maryland Casualty Co.* (2002) 27 Cal.4th 718 [117 Cal.Rptr.2d 318, 41 P.3d 128] (*Hamilton*), where the court concluded that a stipulated judgment, confirmed in good faith pursuant to Code of Civil Procedure section 877.6, "did *not* amount to a judicial finding that the insured was actually liable in the agreed amount because (1) there was no evidentiary hearing to determine the insured's liability, (2) the settlement resulted from negotiation rather than factfinding, and (3) the purpose of a good faith determination is to ensure that the settling tortfeasor pay no less than its proportionate share of liability, while the insurer's concern is that the insured pay no more than its share. (*Hamilton, supra,* 27 Cal.4th at pp. 729–730 [117 Cal.Rptr.2d 318, 41 P.3d 128].)" (*Wolkowitz, supra,* 112 Cal.App.4th at p. 163.) In the absence of a judicial finding after a contested evidentiary hearing, *Wolkowitz* concluded that the order granting the claim allowance may bind the debtor insured, but not the insurer. (*Id.* at p. 165.)

Like the claim allowance hearing in *Wolkowitz,* the bankruptcy confirmation proceedings here contained none of the attributes of an actual trial. The confirmation hearing was not a contested evidentiary hearing. Indeed, the bankruptcy court expressly limited the scope of the hearing to Fuller-Austin's one-hour presentation of evidence in support of disclosure and the proposed Plan, without any cross-examination. Moreover, the "evidence" offered during the hearing did not address Fuller-Austin's liability; rather, the testimony focused on the Plan's fairness to the claimants. Further, the Plan was the result of negotiation—not factfinding. As indicated in the disclosure statement and repeated in the bankruptcy court findings, the Plan developed during four months of intense negotiations between DynCorp, Fuller-Austin and representatives of present and future asbestos claimants. Additionally, the key purpose of the bankruptcy court's findings was to ascertain the Plan's good faith and reasonableness as to the asbestos claimants. (See, e.g., *In re General Teamsters, Local 890* (Bankr. N.D.Cal. 1998) 225 B.R. 719, 728–729 [for chapter 11 plan to be confirmed, it must exhibit fundamental fairness in dealing with creditors].) The bankruptcy court intentionally did not address the Plan's fairness to appellants, as it found that they were "not 'directly and pecuniarily affected' " by the Plan.

Though both *Hamilton* and *Wolkowitz* arose in a different factual context—where the absence of a judicial finding of liability precluded the insureds from seeking damages for their insurers' alleged bad faith refusal to settle—we can discern no reasoned basis to depart from the conclusion reached in those cases that court confirmation of a negotiated settlement lacks the attributes of an actual trial. (See *Hamilton, supra,* 27 Cal.4th at p. 729; *Wolkowitz, supra,* 112 Cal.App.4th at pp. 165–166.)

The two California cases relied on by the trial court do not compel a different result. *Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500 [42 Cal.Rptr.2d 295] (*Pruyn*) simply foreshadowed *Hamilton* by finding that a stipulated judgment determined to be made in good faith pursuant to Code of Civil Procedure section 877.6 did not exhibit the attributes of an "actual trial": " '(1) an independent adjudication of facts based on an evidentiary showing; and (2) a process that does not create the potential for abuse, fraud or collusion.' " (*Pruyn, supra,* at p. 517.) At best, such a judgment would be entitled to evidentiary weight as against an insurer that wrongfully refused to defend its insured. (*Id.* at pp. 527–529.) *Pruyn* relied on *National Union Fire Ins. Co. v. Lynette C.* (1994) 27 Cal.App.4th 1434 [33 Cal.Rptr.2d 496] (*Lynette C.*), the second case cited by the trial court, for its two indicia of an "actual trial." While *Lynette C.* bears some superficial similarity to the instant action to the extent that the trial involved a one- and one-half hour uncontested presentation of evidence, any resemblance ends there. In *Lynette C.*, unlike here, the trial court was asked to and did make independent findings on liability and damages. (*Id.* at pp. 1449–1450.) The appellate court expressly contrasted the situation where "the injured party and the insured *resolved* the issues of liability and damages by *agreement,*" concluding that "the uncontested proceeding involved a court independently adjudicating the facts based on an array of evidence." (*Id.* at pp. 1445, 1451.) Significantly, *Lynette C.* further found that the trial court proceeding did not create the potential for fraud or collusion, both because the insurer benefited from a nondisclosure agreement that sealed its insured's court records, thereby limiting the scope of future potential plaintiffs, and because there was significant evidence of the insurer's participation in the events leading up to the uncontested proceeding. (*Id.* at pp. 1451–1452.)

The confirmation proceedings here possessed neither of the *Lynette C.* attributes. Fuller-Austin and the asbestos claimant representatives had resolved all issues before seeking confirmation, and appellants did not participate in prehearing negotiations and were precluded from participating in the confirmation hearing. Accordingly, the bankruptcy court confirmation proceedings were not an "actual trial" within the meaning of the insurance policies.

### 2. *Plan confirmation was a settlement, the effect of which appellants may challenge on retrial.*

Our conclusion that the confirmation proceedings were not an actual trial does not end our inquiry. Rather, it leads us to the further question of whether Plan confirmation constituted an agreement or settlement under the policies. According to the policies' loss-payable provisions, appellants must indemnify only settlements made with their written consent.[7] Though concluding it need not reach the issue of consent given its finding that the confirmation proceedings were an "actual trial," the trial court issued conclusions of law and made factual findings that, alternatively, Fuller-Austin was not required to obtain appellants' consent before settling with the asbestos claimants.

In connection with its conclusion that the prebankruptcy negotiations triggered appellants' obligations to Fuller-Austin, the trial court relied on several related legal principles: "An excess insurance company has a duty to accept reasonable settlements on its policyholder's behalf"; "[e]ven if an excess insurance company has not denied coverage or refused to defend, the insurance company has a duty to accept a reasonable settlement, and its refusal to settle may give rise to the insured's action for reimbursement of the settlement"; and "[a]n excess insurance company's right to participate in settlement negotiations and to consent to settlements only arises where it has acknowledged coverage. If an excess insurance company reserves its right to contest coverage, the policyholder is excused from any provision requiring insurance company consent." In addition to these principles, the trial court expressly adopted the following principles with respect to the issue of consent: " 'An insurer that has erroneously denied coverage cannot avoid liability for its failure to settle or defend by claiming lack of opportunity to do so. By denying coverage, the insurer waives its right to control defense of the third party action.' . . . [¶] . . . '[W]here an insurer does not respond to notice from the insured that it intends to settle with an adversary, the insurer may not then invoke a clause in the policy requiring the insured to obtain approval prior to settling any claims.' "

In terms of factual findings, the trial court characterized the undisputed evidence as establishing that, as of February 1993, Fuller-Austin gave notice to appellants that it may be subject to asbestos claims that would impact its excess and umbrella insurance coverage; that thereafter, it gave appellants notice of potential settlements that it believed would impact their coverage; and that appellants did not pay any portion of the settlements prior to bankruptcy. The trial court also found it "undisputed that (i) Fuller-Austin provided notice to [appellants] that it would entertain global settlement

---

[7] The excess policies also incorporate provisions from the underlying policies prohibiting Fuller-Austin from voluntarily settling any claim without the insurer's prior written consent.

negotiations with representatives of both present and future asbestos claimants with a goal to accomplish a global settlement in conjunction with a filing for bankruptcy, and (ii) Fuller-Austin provided notice to [appellants] of the bankruptcy plan and hearings."

Applying the foregoing legal principles to the undisputed evidence, the trial court found that Fuller-Austin complied with its policy obligations by giving appellants notice of the settlement, that appellants had a duty to Fuller-Austin to accept a reasonable settlement, and that they acted at their own peril by refusing to accept the settlement.[8] In other words, by reserving their rights instead of acknowledging coverage and assuming the defense of the matter, appellants surrendered their right to rely on any policy provision requiring their consent to a settlement.

Appellants do not dispute that Fuller-Austin's bankruptcy reorganization constituted a settlement. Documents filed in the bankruptcy court uniformly characterized the Plan as a "settlement." For example, one section of the disclosure statement captioned "Plan Negotiations" outlined the negotiation process that resulted in the Plan documents, while the following section captioned "Global Settlement" stated: "These negotiations ultimately resulted in a global settlement by Fuller-Austin, DynCorp, the Committee and the Legal Representative which called for the filing of a prepackaged plan of reorganization by Fuller-Austin in the Bankruptcy Court." Similarly, the bankruptcy court findings provided: "The Plan Documents, including without limitation, the CRP, are the product of negotiations and represent a non-collusive settlement among the Debtor, the Committee and the Legal Representative (the 'Global Settlement')."

The settlement, however, is unique to the extent that it establishes criteria and procedures for resolving asbestos claims, but does not serve actually to resolve any claim. Nonetheless, because the Plan is designed to provide a single mechanism for resolving all present and future claims against Fuller-Austin, and, more importantly, because Fuller-Austin has elected to characterize the Plan as a binding resolution of its liability, we find that it possesses indicia of a settlement. Fuller-Austin's conduct distinguishes this matter from *In re A.P.I., Inc., supra*, 331 B.R. 828. There, the court rejected the insurers' argument that they had a right to consent to a settlement effected by a plan confirmation under section 524(g). It determined that the insurers' fear of collateral consequences stemming from the settlement was unfounded, because the plan expressly provided that it had no binding effect in any other forum. (*In re A.P.I., Inc., supra*, at pp. 844–846.) Though the Plan here contains similar language indicating that appellants' rights are unaffected by

---

[8] The trial court further found that certain presumptions arose from appellants' failure to accept the settlement, which we discuss in part III., *post*.

the Plan, appellants' concerns regarding the effect of the settlement are well founded in view of the successful position taken by Fuller-Austin below that confirmation of the section 524(g) Plan was a determination of its liability binding on appellants.

■ It is undisputed that Fuller-Austin did not obtain appellants' consent to the Plan. Appellants contend that the trial court misapplied the law in concluding that they surrendered their right to consent simply by reserving their right to contest coverage. They assert that only an insurer that has breached its duty to an insured by erroneously denying coverage or a defense waives its right to consent. On an abstract level, their position is correct. California law provides that where an insurer provides a defense to its insured—even under a reservation of rights—the insured may not settle the matter without its insurer's consent. (*Safeco Ins. Co. v. Superior Court* (1999) 71 Cal.App.4th 782, 787 [84 Cal.Rptr.2d 43] ["When the insurer provides a defense to its insured, the insured has no right to interfere with the insurer's control of the defense, and a stipulated judgment between the insured and the injured claimant, without the consent of the insurer, is ineffective to impose liability upon the insurer"]; accord, *Low v. Golden Eagle Ins. Co.* (2003) 110 Cal.App.4th 1532, 1546–1547 [2 Cal.Rptr.3d 761]; *Wright v. Fireman's Fund Ins. Companies* (1992) 11 Cal.App.4th 998, 1024 [14 Cal.Rptr.2d 588].) Conversely, "if the insurer wrongfully refuses to defend, leaving the insured to his own resources to provide a defense, then the insurer forfeits the right to control settlement and defense. In that event, the insured is free to settle the lawsuit on his own, and the insurer is bound by a stipulated judgment. [Citations.]" (*Safeco Ins. Co. v. Superior Court, supra,* 71 Cal.App.4th at p. 787; see also *United Services Automobile Assn. v. Alaska Ins. Co.* (2001) 94 Cal.App.4th 638, 644 [114 Cal.Rptr.2d 449] ["when an excess insurer denies excess coverage for a third party claim, it waives the right to challenge the reasonableness of the primary insurer's settlement of the claim"].)

Summarized, California law provides that a defending insurer must consent to a settlement in order for there to be coverage, but "if an insurer 'erroneously denies coverage and/or improperly refuses to defend the insured' in violation of its contractual duties, 'the insured is entitled to make a reasonable settlement of the claim in good faith and may then maintain an action against the insurer to recover the amount of the settlement . . . .' [Citation.]" (*Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791 [244 Cal.Rptr. 655, 750 P.2d 297].) The trial court erred in finding that these principles mandated the conclusion that appellants had surrendered their right to consent solely by reserving their rights and not undertaking the defense of the matter. An insurer does not breach any duty to the insured merely by reserving its rights under the policy. (*Prichard v. Liberty Mutual Ins. Co.* (2000) 84 Cal.App.4th 890, 895, 908 [101 Cal.Rptr.2d 298].) Thus, by reserving their rights to contest coverage, appellants did not wrongfully deny

coverage in violation of their policies. Moreover, appellants did not breach any duty to defend Fuller-Austin, as their policies did not contain any defense obligations. Finally, the jury verdict further establishes that appellants did not relinquish their right to consent to a settlement by reason of any breach of the policies.[9] The jury responded "Did Not Breach" in answer to the question "Did any defendant breach its insurance contract(s) with Fuller-Austin *before* confirmation of Fuller-Austin's Bankruptcy Plan on November 13, 1998?"[10] Accordingly, neither the law nor the facts support the trial court's conclusion that appellants waived their right to consent to the Plan because they breached their policies by erroneously denying coverage or refusing to defend.

On the other hand, because appellants were neither acknowledging coverage nor providing a defense, and therefore were in no way exercising control over the asbestos claims brought against Fuller-Austin, we find it difficult to permit appellants to rely, without qualification, on a consent provision that is designed to protect defending insurers. (See, e.g., *Low v. Golden Eagle Ins. Co., supra,* 110 Cal.App.4th at pp. 1546–1547 [defending insurer not bound by settlement negotiated by insured without insurer's consent].) Indeed, appellants have not directed us to a case holding that a nonbreaching excess insurer with knowledge of an impending settlement may decline to participate in settlement negotiations, yet then rely on the policy's consent provision to avoid responsibility under the settlement.

■ An insurer and an insured owe reciprocal duties of good faith to one another. (*Commercial Union Assurance Companies v. Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 918 [164 Cal.Rptr. 709, 610 P.2d 1038] (*Safeway Stores*); *Diamond Heights Homeowners Assn. v. National American Ins. Co.* (1991) 227 Cal.App.3d 563, 578 [277 Cal.Rptr. 906] (*Diamond Heights*).) The nature of each party's duty is to refrain from doing anything that would injure the other's right to receive the benefits of the contract. (*Safeway Stores, supra,* 26 Cal.3d at p. 918.) In view of the nature of excess insurance, the insured has no duty to an excess insurer to accept or reject a settlement offer that protects the insurer from liability. (*Id.* at pp. 919–921.) In other words, an excess insurer "has no legitimate expectation that the insured will ' "give at least as much consideration to the financial well-being" ' of the insurance company as

---

[9] Fuller-Austin's failure to pursue its cross-appeal precludes it from challenging the jury's finding of no preplan breach by appellants. (E.g., *Kardly v. State Farm Mut. Auto. Ins. Co.* (1995) 31 Cal.App.4th 1746, 1748, fn. 1 [37 Cal.Rptr.2d 612]; *California State Employees' Assn. v. State Personnel Bd.* (1986) 178 Cal.App.3d 372, 382, fn. 7 [223 Cal.Rptr. 826].) This is not the type of situation where reversal of the entire judgment is required because the portion of the judgment adverse to the nonappealing party is so interwoven with and thereby affects the other portions of the judgment. (See *Harvey v. White* (1963) 213 Cal.App.2d 275, 282 [28 Cal.Rptr. 601].)

[10] We address the jury's contrary finding as to LMI's Cities Service coverage in part IV.A., *post.*

he does to his " 'own interests' " [citation]." (*Id.* at p. 919.) On the other hand, an excess insurer, although not contractually obligated to take an active part in the defense of an insured, still owes its insured a duty of good faith when faced with an offer of settlement that exhausts the underlying policy limits. (*Kelley v. British Coml. Ins. Co.* (1963) 221 Cal.App.2d 554, 563 [34 Cal.Rptr. 564] [excess insurer "obviously under a duty to exercise good faith toward its insured in considering any offer of compromise within the limits of its policy"].)

*Diamond Heights* provides the most analogous application of these good faith principles as between an excess insurer and its insured. There, a primary insurer sued an excess insurer, seeking contribution toward a stipulated judgment, and the excess insurer (Central) moved for summary judgment on the ground that the settlement violated a policy provision—a "no-action" clause—requiring its consent. (*Diamond Heights, supra,* 227 Cal.App.3d at pp. 570–571.) In the settled action, an insured developer had been sued for construction defects. Its primary insurer provided a defense and notified Central that settlement demands exceeded primary coverage and that it was likely primary policy limits would be exhausted. (*Id.* at pp. 569–570, 574.) Central responded by investigating the case, and thereafter reserving its rights under the policy. (*Id.* at p. 575.) A few months later, defense counsel notified Central that both its assessment of the repair work and the plaintiffs' settlement demand exceeded primary policy limits, and sought information on Central's position. Though Central offered to contribute a nominal sum toward settlement, the matter settled on the first day of trial, without Central's contribution and with its objection to the settlement on the record. (*Ibid.*) Defense counsel then sought and obtained an order confirming a good faith settlement pursuant to Code of Civil Procedure section 877.6. The trial court found that the settlement was reasonable and not the product of fraud or collusion, thereby overruling Central's objections on those grounds. (*Diamond Heights, supra,* at p. 575.)

Central's summary judgment motion was premised on the notion that a nonbreaching insurer acts within its contractual rights "whenever it refuses to voluntarily settle a claim and insists on adjudication of the matter on the merits. [Citation.]" (*Diamond Heights, supra,* 227 Cal.App.3d at p. 576.) Though the trial court concluded that summary judgment was warranted, the appellate court reversed. Significantly, it framed the dispositive issues as: "Were the primary insurers entitled to settle the case for an amount which invaded excess coverage without the excess insurer's consent? Conversely, did the excess insurer have the absolute right under [the policy] to object to and therefore preclude any settlement which invaded excess coverage, even if reasonable and made in good faith, thereby compelling the primary insurer to continue the litigation and provide a defense through trial?" (*Id.* at p. 580.) The court concluded that, subject to certain conditions, "a primary insurer may

negotiate a good faith settlement of a claim in an amount which invades excess coverage, and that the primary insurer may enter into such settlement binding upon the excess insurer without the excess insurer's consent," notwithstanding a policy provision requiring consent to a settlement. (*Ibid.*)

The *Diamond Heights* court explained that the good faith duties owed by an excess insurer include the obligation to evaluate settlement options realistically and in good faith where a claim may exceed primary policy limits. (*Diamond Heights, supra,* 227 Cal.App.3d at p. 580.) "Consistent with its good faith duty, the excess insurer does not have the absolute right to veto arbitrarily a reasonable settlement and force the primary insurer to proceed to trial, bearing the full costs of defense. A contrary rule would impose the same unnecessary burdens upon the primary insurer and the parties to the action, among others, as does the primary insurer's breach of its good faith duty to settle: ' ". . . [I]t imperils the public and judicial interests in fair and reasonable settlement of lawsuits . . . ." ' [Citations.]" (*Id.* at pp. 580–581.) The court did not leave the excess insurer without any remedy, however. It explained that an excess insurer faced with a settlement that invades its coverage may either assume the defense and settle or try the matter, or challenge the settlement on the grounds of unreasonableness, fraud or collusion. (*Id.* at p. 582.)

The rationale of *Diamond Heights* applies here.[11] It would impose an unnecessary burden on primary insurers and parties to an underlying action to hold that an excess insurer has an absolute right to withhold its consent to a settlement, while at the same time decline to participate in the action. Appellants contend that *Diamond Heights* cannot be applied here. Their first argument focuses on language following the court's good faith discussion. In explaining why its conclusion did not conflict with the insurance policy language requiring consent, the *Diamond Heights* court stated: "[W]e conclude the excess insurer *may* waive its rights under that clause if it rejects a reasonable settlement and at the same time fails to offer to undertake the defense." (*Diamond Heights, supra,* 227 Cal.App.3d at p. 581.) The court then analogized these circumstances to a primary insurer's breach of the policy, noting that a primary insurer that wrongfully denies coverage, unreasonably delays processing a claim or refuses to defend may be deemed to have waived its right to consent to a settlement "by such conduct constituting a breach of its obligations under the policy." (*Ibid.*) Appellants assert that *Diamond Heights*

---

[11] We acknowledge that *Diamond Heights* has been criticized, but this criticism revolves around its further conclusion that Central was bound by the good faith settlement determination as a "co-obligor." (*Diamond Heights, supra,* 227 Cal.App.3d at p. 582.) Subsequent cases have clarified that an excess insurer is not conclusively bound by a good faith settlement determination in which it did not participate. (*Hartford Accident & Indemnity Co. v. Superior Court* (1995) 37 Cal.App.4th 1174, 1184 [44 Cal.Rptr.2d 126]; *Pacific Estates, Inc. v. Superior Court* (1993) 13 Cal.App.4th 1561, 1576 [17 Cal.Rptr.2d 434].) We have not relied on the portion of *Diamond Heights* that addresses the effect of the good faith determination.

is simply a restatement of prior authority holding that an insurer that breaches its policy waives its right to consent to a settlement and argue the case is therefore inapplicable here because the jury found that appellants did not breach their policies before Plan confirmation.[12] (See, e.g., *Isaacson v. California Ins. Guarantee Assn., supra,* 44 Cal.3d at p. 791.)

We do not read *Diamond Heights* so narrowly. The court did not hold that an excess insurer breaches its policy when it rejects a reasonable settlement and simultaneously declines to undertake the defense. Rather, the court utilized the "somewhat analogous situation" of a primary insurer's breach of policy provisions as an analytical tool to describe the effect of an excess insurer's decision to withhold consent to an otherwise reasonable settlement. (*Diamond Heights, supra,* 227 Cal.App.3d at pp. 580–581.) Indeed, treatises interpreting *Diamond Heights* omit the entire concept of breach in discussing the effect of a settlement made without the excess insurer's consent: "[A] primary insurer may enter into a good-faith settlement of a claim in an amount which invades excess coverage and is binding on the excess insurer without the excess insurer's consent, notwithstanding a 'no action' clause in the excess policy because an excess insurer does not have an absolute right to veto arbitrarily a reasonable settlement and force the primary insurer to proceed to trial, bearing full costs of defense, and the excess insurer waives its right under the 'no action' clause if it rejects a reasonable settlement and, at same time, fails to offer to undertake the defense. [Fn. omitted.] Nevertheless, an excess insurer is not without means of avoiding a proposed settlement or challenging final settlement since the excess insurer may voluntarily waive a policy provision indicating that the excess insurer is not to be called upon to assume charge of settlement or defense, and may agree to undertake the defense (once the primary insurer tenders its full policy limits) and either conduct its own settlement negotiations or take the action to trial, or the excess insurer may challenge the settlement on the ground of unreasonableness or that it is product of collusion between the primary insurer and the insured. [Fn. omitted.]" (14 Couch on Insurance (3d ed. 1999) § 204:33, p. 204-48; see also Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶ 8:123, p. 8-57 [interpreting *Diamond Heights* to provide that a primary insurer need not obtain the excess insurer's consent to negotiate a good faith settlement of a claim in an amount which invades excess coverage].)

Appellants further assert that *Diamond Heights* is factually distinguishable because the excess insurer there was provided with ample notice of the settlement and therefore had an opportunity to evaluate it, whereas Fuller-Austin provided inadequate notice of and actively excluded appellants from

---

[12] As to appellant CNA, which settled before trial, the trial court held on summary adjudication that it had not breached its contract with Fuller-Austin.

the settlement negotiations. The record does not support their assertion. With respect to the issue of notice, the trial court found it undisputed that Fuller-Austin provided notice to appellants of its settlement negotiations and its goal to effect a global settlement in connection with filing for bankruptcy, as well as notice of the Plan and hearings. Substantial evidence supports these findings. (See *Shapiro v. San Diego City Council, supra,* 96 Cal.App.4th at p. 912.) As early as March 1993, Fuller-Austin notified appellants that existing and future asbestos claims against it could implicate excess coverage. For the next few years, Fuller-Austin thereafter kept appellants apprised of the asbestos litigation and afforded them access to the underlying claim documents. Moreover, the coverage litigation initiated in 1994 gave appellants access to asbestos claims information through discovery.

The record likewise does not support appellants' claim that Fuller-Austin unreasonably conditioned appellants' participation in the initial meeting to discuss the prepackaged Plan. Though appellants characterize the letter Fuller-Austin sent to them as requiring them to waive all their rights under the policies in order to participate in the meeting, that is not what the letter said. Rather, it stated that Fuller-Austin would not accept appellants' assuming the defense of the action under a reservation of rights, but indicated that appellants could participate in the negotiations if they executed a confidentiality agreement "to protect the privileged nature of the discussions, and to avoid interference with the negotiation process." Substantial evidence supports the trial court's finding that appellants were afforded a reasonable opportunity to participate in the settlement negotiations.

Appellants' final effort to distinguish *Diamond Heights* has some merit. Appellants—unlike the excess insurer in *Diamond Heights*—were precluded from participating in the proceeding that determined the reasonableness of the settlement. (See *Diamond Heights, supra,* 227 Cal.App.3d at p. 575.) Appellants sought to intervene and filed objections to the Plan in the bankruptcy court, but those objections were not considered in view of the court's conclusion that appellants lacked standing. The basis for this conclusion was that appellants' objections could be raised in another forum. During the course of the bankruptcy proceedings, the bankruptcy court and all parties repeatedly represented that the Plan would have no impact on appellants' claims and defenses in the coverage litigation. The Plan itself confirms this understanding, providing that "all claims and defenses of any Asbestos Insurance Company that is a party to the Coverage Litigation shall be adjudicated in the Coverage Litigation, and all rights of the Asbestos Insurance Companies under the Asbestos Insurance Policies shall remain unaffected by the Plan or the Confirmation Order." (Compare *In re Celotex Corp., supra,* 204 B.R. at p. 615 [insurers were afforded a fair, reasonable and appropriate right to participate where a section 524(g) plan provided that an insurer from whom coverage is sought has the opportunity to participate in the

resolution and defense of a claim by contending that the claim should not be allowed or should be allowed in a lesser amount under the claims resolution procedures].)

The *Diamond Heights* court concluded that an excess insurer that does not participate in a settlement is still entitled to protection against unreasonable or collusive settlements, and for that reason may "challenge the settlement on the ground of unreasonableness or that it is a product of collusion between primary insurer and insured." (*Diamond Heights, supra,* 227 Cal.App.3d at p. 582, fn. omitted; see also 14 Couch on Insurance, *supra,* § 199:48, p. 199-92 [an insured may enter into a settlement without the insurer's consent so long as the agreement is "made fairly, with notice to the insurer, and without fraud or collusion on the insurer, and the settlement is reasonable and prudent"], fns. omitted.) In *Diamond Heights*, "Central . . . had the opportunity to participate at the [Code of Civil Procedure] section 877.6 hearing, present evidence and arguments, and fully litigate the issues of good faith and reasonableness." (*Diamond Heights, supra,* at pp. 582–583.)

Here, however, as a result of Fuller-Austin's successful challenge to appellants' effort to intervene in the bankruptcy proceedings, appellants did not have the opportunity in the bankruptcy court to address the issues of fairness, reasonableness and lack of fraud or collusion. The bankruptcy court's "good faith" finding was inadequate to address these issues, as that finding was limited to the Plan's reasonableness as to the asbestos claimants. (See *In re General Teamsters, Local 890, supra,* 225 B.R. at pp. 728–729.) Appellants' interests were not represented at the Plan confirmation hearing. (Cf. *Hamilton, supra,* 27 Cal.4th at p. 729 [good faith settlement hearing does not address an insurer's concerns as to whether its insured is too easily admitting liability or agreeing to pay more than its proportionate share of liability].) Moreover, to conclude that the bankruptcy court's good faith finding adjudicated the issue of reasonableness as to appellants would contradict Fuller-Austin's repeated representations that the Plan and its confirmation did not affect appellants' rights under their policies or their claims and defenses in the coverage litigation.

Allowing Fuller-Austin to enter into a global settlement in the bankruptcy court without appellants' participation, while permitting appellants to challenge the Plan for fairness, reasonableness and lack of fraud or collusion in the instant action, does no violence to the policy language requiring appellants' consent. (*Diamond Heights, supra,* 227 Cal.App.3d at p. 581.) We do not believe that the policies can be read to permit an excess insurer to hover in the background of critical settlement negotiations and thereafter resist all responsibility on the basis of lack of consent. Nor, however, do we believe that appellants waived all rights under the policies

where they attempted to participate in the final stages of the section 524(g) proceedings but were directed to raise their objections in this action. On remand, appellants will be entitled to litigate the issue of whether, as to them, the Plan is unfair, unreasonable or the product of fraud or collusion.

### C. *The Effect of the Aggregate Value Determination.*

A further key feature of the phase IB statement of decision was its determination that Fuller-Austin would "be entitled to present evidence to a jury regarding its aggregate asbestos liability—*i.e.,* the present liability of Fuller-Austin to pay pending and future asbestos claims," and that the jury's valuation would be binding on appellants. Noting that courts have endorsed certain methodologies for calculating the value of future asbestos claims, the trial court reasoned that future damages are commonly awarded in contract actions where, as here, there is a sufficient method for ascertaining their amount. As additional support for its conclusion, the trial court relied heavily on *UNR Industries, Inc. v. Continental Cas. Co.* (7th Cir. 1991) 942 F.2d 1101 (*UNR Industries*). There, the court held that an order confirming a bankruptcy reorganization was binding on the debtor's insurers; the conclusive effect of the order included the bankruptcy court's determination of the aggregate value of all claims asserted against the debtor. (*Id.* at p. 1105.)

Appellants challenge this determination on the ground it amounts to an unlawful acceleration of their contractual obligations. They assert that their duty to indemnify Fuller-Austin arises only after damages have been fixed in their amount (e.g., *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 958 [103 Cal.Rptr.2d 672, 16 P.3d 94] (*Powerine Oil*)) and that a jury's estimation of present and potential future claims against Fuller-Austin is not the equivalent of a fixed amount of damages. We agree. While calculating the aggregate value of present and future asbestos claims is helpful and often necessary in other contexts, no authority exists for utilizing such a valuation to affix an insurer's indemnity obligation. To the contrary, cases addressing the concept of aggregation in the bankruptcy context repeatedly reaffirm its limited scope and purpose. To hold that a jury's estimation of the value of present and potential future asbestos claims is binding on appellants would obligate them to indemnify Fuller-Austin in an amount beyond what their policies provide.

Appellants' excess insurance policies generally provide that appellants must "indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability [¶] (a) imposed upon the Assured by law [¶] . . . [¶] for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of: [¶]

(i) Personal injuries . . . ." In turn, the policies typically define "ultimate net loss" as "the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise . . . ." Other policies similarly define "loss" as "the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable . . . ."

■ Consistent with these policy provisions, California courts hold that " 'the duty to indemnify "entails the payment of money" [citations],' 'has as its purpose "to resolve liability . . . *after* liability is established" [citations],' and 'can arise only after damages are fixed in their amount [citations]' [citation]." (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 417 [33 Cal.Rptr.3d 583, 118 P.3d 607]; accord, *Powerine Oil, supra*, 24 Cal.4th at p. 958 ["the duty to indemnify can arise only after damages are fixed in their amount"]; *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 56 [70 Cal.Rptr.2d 118, 948 P.2d 909] [by definition, the duty to indemnify "entails the payment of money [citation], which is expressly limited in amount [citation], in order to resolve liability"]; *State of California v. Pacific Indemnity Co.* (1998) 63 Cal.App.4th 1535, 1546 [75 Cal.Rptr.2d 69] ["The duty to indemnify arises after liability is established and requires payment of money up to the policy limit either to third parties or, in equity, to the insured"].)

■ The trial court here concluded that the jury's estimation of Fuller-Austin's aggregate asbestos liability would be adequate to establish the amount of Fuller-Austin's present asbestos liability, thereby triggering appellants' duty to indemnify. Cases involving the concept of asbestos claim estimation, however, emphasize both that the purpose of calculating an aggregate claim amount is not to determine liability and that such estimation does not reflect the amount that will be paid to the asbestos claimants. For example, in *Owens Corning v. Credit Suisse First Boston* (D.Del. 2005) 322 B.R. 719, the bankruptcy court estimated the value of unliquidated pending and future asbestos claims for the purpose of determining the rights of each class of creditors in the reorganization. The court expressly cautioned that its valuation was for a limited purpose: "We are not, at this time, deciding how much each claimant will actually be entitled to receive, but the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date." (*Id.* at p. 722; see also *In re Federal-Mogul Global, Inc.* (D.Del. 2005) 330 B.R. 133, 154 [the object of estimating the value of present and future asbestos claims "is to establish the estimated value of a creditor's claim for purposes of formulating a reorganization plan"].)

This authority is consistent with cases generally addressing the limited purpose of bankruptcy claim estimation in the nonasbestos personal injury context. For example, in *Matter of Federal Press Co.* (Bankr. N.D.Ind. 1989) 116 B.R. 650, the court explained that it had the authority to estimate the value of a personal injury claim "to determine the weight to be given the claim for purposes of voting on the debtor's plan of reorganization, and not for the purpose of determining the debtor's ultimate liability for the claim or the amount of the claim for purposes of distribution." (*Id.* at p. 653.) Likewise, the court in *In re Hoffinger Industries, Inc.* (Bankr. E.D.Ark. 2004) 307 B.R. 112, 118, succinctly stated: "This Court may not estimate contingent or unliquidated personal injury or wrongful death claims for purposes of distribution, but may do so for purposes of determining the feasibility of a plan of reorganization." (See also *In re Bicoastal Corp.* (Bankr. M.D.Fla. 1990) 122 B.R. 771, 775 ["[E]stimation of claims in bankruptcy does not establish a binding legal determination of the ultimate validity of a claim nor a binding determination of any issues"].)

While this authority demonstrates that a bankruptcy court's claim estimation cannot serve as a determination of the amount to be distributed to an asbestos claimant, we believe it further mandates that a state court jury's estimation of present and future claims cannot be used to establish the amount of Fuller-Austin's liability.[13] To reach a contrary conclusion, the trial court relied on cases holding that future damages are recoverable in a breach of contract action where the amount, but not the fact, of those damages is uncertain. (See *Stott v. Johnston* (1951) 36 Cal.2d 864, 875–876 [229 P.2d 348]; *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745 [203 P.2d 778].) Fuller-Austin relies on these and similar cases in an effort to sustain the trial court's determination. (See, e.g., *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 [274 Cal.Rptr. 168] ["Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty"].) But the estimation authorized here involved an entirely different situation—where a jury was asked not only to resolve the amount but also the fact of potential future asbestos claims. As explained in *Noble v. Tweedy*, "an award of damages could not be granted upon the basis of anticipated future

---

[13] Recently, in *In re A.P.I., Inc., supra,* 331 B.R. 828, the court found no merit to the insurers' concern that a bankruptcy court's finding on the total value of outstanding asbestos related claims would be binding on the insurers in other forums, and specifically added that even such a determination in the ongoing state court coverage action could not have any immediate impact on the insurers: "The feared preclusion would most likely bloom in coverage litigation. However, the insurers did not detail any theory of law under which an 'estimate' of the Debtor's outside personal liability, as a single undifferentiated figure, would translate into any direct jeopardy to the particular insurers' 'pecuniary' rights and duties, at least insofar as adjudication in another forum is concerned and particularly as to any individual claim that would be subject to indemnification." (*Id.* at p. 851, fn. 39.)

injuries or other [purely hypothetical] events . . . ." (*Noble v. Tweedy, supra,* 90 Cal.App.2d at p. 746, italics omitted.)

To address the problem of inherent uncertainty in a jury's determination of the value of future claims that have not been (and may never be) filed, the trial court reasoned that cases acknowledging and approving of certain types of methodologies to calculate the value of present and future asbestos claims demonstrated a satisfactory method for ascertaining an aggregate asbestos claim value. But consistent with the limited role of bankruptcy claim estimation, those cases sanction the use of expert testimony for purposes other than determining the amount of a debtor's liability. (See *In re Joint E. & S. Dists. Asbestos Litigation* (E.D. & S.D.N.Y., Bankr. S.D. N.Y. 1993) 830 F.Supp. 686, 689 [expert panel appointed to estimate value of future asbestos claims to ensure that proposed modification of soon-to-be insolvent trust was fair and "no reasonable evaluation of the fairness of a proposed settlement of the class action could be made without a firm grasp of the likely number and value of future claims against the Trust"]; *In re Eagle-Picher Industries, Inc.* (Bankr. S.D.Ohio 1995) 189 B.R. 681, 682–683 [court relied on expert testimony to estimate value of present and future asbestos claims where valuation was for the purpose of determining the appropriate distributions to creditor classes and not for the purpose of deciding liability or permanently fixing a value for such claims].) These cases demonstrate only that a determination as to the probable number and value of future asbestos claims assists in formulating a reorganization plan, increases a trust's planning capabilities and promotes parity among present and future claimants. (See *In re Joint E. & S. Dists. Asbestos Litigation, supra,* 830 F.Supp. at p. 690.)

Further, the trial court relied on an inapposite case addressing the concept of reinsurance to support its conclusion that a jury's aggregate estimate of present and future claims could bind not only Fuller-Austin but also appellants. The only similarity between *Ins. Co. of Pennsylvania v. Associated Intern.* (9th Cir. 1990) 922 F.2d 516 (*Associated Intern.*) and the case before us, however, is that both involve asbestos claims. In *Associated Intern.,* a settlement agreement between the insured (Fibreboard) and its primary insurer (ICP) required ICP to pay for " 'future, unidentified claims' . . . ." (*Id.* at p. 525.) Relying solely on the language of the reinsurance contract, the court held that the reinsurer (Associated) must indemnify ICP for future claims: "Pursuant to the reinsurance contract, Associated's liability 'shall follow that of [ICP] and shall be subject in all respects to all the terms and conditions of the [ICP-Fibreboard] policy. . . .' Under the ICP-Fibreboard policy, ICP is required 'to indemnify [Fibreboard] for all sums which [Fibreboard] shall be obligated to pay by reason of the liability. . . .' Therefore, since the asbestos claims represent a liability against Fibreboard which it is obligated to pay, ICP must indemnify Fibreboard, and, pursuant to the reinsurance contract, Associated is required to indemnify ICP." (*Id.* at p. 526.) *Associated Intern.*

thus stands for the unremarkable proposition that "all sums" a party is "obligated to pay" includes the payment of future claims when a party has contractually obligated itself to pay for those claims. It does not support the trial court's more generalized conclusion that an insurer may be bound to pay for future claims.

Plainly, the centerpiece of the trial court's aggregate value discussion is *UNR Industries, supra,* 942 F.2d 1101. There, when faced with thousands of asbestos claims, UNR petitioned for bankruptcy reorganization. Though the reorganization occurred before the enactment of section 524(g), the bankruptcy court approved a then innovative plan whereby UNR transferred most of its stock to a trust, which would fully settle and satisfy all asbestos claims. (*UNR Industries, supra,* at p. 1104.) Significantly, "[t]he reorganization required UNR to pay a sum certain (the stock, which had a market value of $150 million) in satisfaction of the asbestos claims." (*Id.* at p. 1105.) Thereafter, UNR brought an action against two of its excess insurers, including CNA, alleging that they were responsible for at least some of the claims. (*Id.* at p. 1103.) Though the district court dismissed UNR's complaint, the Court of Appeals reversed in part, concluding that the bankruptcy reorganization resulted in a judgment or a settlement binding on CNA under Illinois law. (*Id.* at pp. 1104–1105.)

With respect to the amount of CNA's obligation, the court found that the disclosure statement's valuation of the asbestos claims as being " '2.27 times greater' than the other unsecured claims" yielded $254 million as the real value of the asbestos claims which would be binding on CNA. (*UNR Industries, supra,* 942 F.2d at pp. 1105, 1106.) Despite CNA's not having participated in the valuation, the court found no danger that the valuation was collusive or excessive, as UNR's other creditors also approved the valuation and "[t]his antagonism of interests removes any significant danger that the $254 million valuation of the asbestos victims' claims might contain any artificial inflation at CNA's expense." (*Id.* at p. 1106.)

While appellants assert several bases for distinguishing *UNR Industries* from this matter, we believe a single key distinction renders it inapplicable. *UNR Industries* relied on a bankruptcy court valuation that was based on a finite sum that would be used to settle identifiable asbestos claims, as the reorganization plan required that all asbestos claims be paid from the amount of stock transferred to the trust. (*UNR Industries, supra,* 942 F.2d at p. 1105.) There is no indication in *UNR* that the negotiated valuation considered claimants who had not yet been identified. Here, in contrast, any estimation of Fuller-Austin's asbestos liability necessarily involves quantifying future and unknown claim amounts. Indeed, any reliance on *UNR Industries* ignores the critical distinction between section 524(g) and other types of bankruptcy, as

only section 524(g) permits an entity to shield itself from asbestos liability by diverting not only present, but also future or unknown claimants, to a limited fund for payment. (See *Asbestos Bankruptcies, supra,* 12 Am. Bankr. Inst. L.Rev. at p. 444.) Because *UNR Industries* preceded the enactment of section 524(g), it could not have taken into account the unique features of that provision.

We thus find no authority—and decline to create any—that would permit a jury to estimate the aggregate sum of an insured's liability for present and potential future asbestos claims for the purpose of accelerating its insurers' obligations. (See *In re A.P.I., Inc., supra,* 331 B.R. at p. 851, fn. 39.) Moreover, allowing an aggregate estimate of Fuller-Austin's liability to bind appellants would impermissibly grant Fuller-Austin greater rights under its insurance policies than it had prior to bankruptcy. (See *In re Coupon Clearing Service, Inc., supra,* 113 F.3d at p. 1099; see also *Amatex Corp. v. Stonewall Ins. Co.* (E.D.Pa. 1989) 102 B.R. 411, 414 [estimates of debtor's future asbestos liability "represent only the *possibility* that the [insurance] policies would be triggered" and did not amount to a legal obligation to pay damages under the policies].) Such an estimation does not and cannot represent the amount that Fuller-Austin is legally obligated to pay and, therefore, does not trigger appellants' indemnification obligations under their policies.

### D. *The Effect of the Plan's Allowed Liquidated Value Amounts.*

Consistent with its conclusion that an aggregate value determination would bind appellants, the trial court further found that appellants were obligated to indemnify Fuller-Austin for the ALV of each claim—not the payment sum percentage that Fuller-Austin will actually pay each claimant. This was error.

The Plan's CRP expressly acknowledge that "there are not sufficient assets in the Debtor's Estate to pay the full and fair value of all Asbestos Claims. Thus, the formation of the Trust is premised upon the overarching goal of the Reorganization Case—maximizing the value of the amount paid to each holder of an Allowed Asbestos Claim. Simultaneously, the Trustees must act in a manner designed to provide substantially the same treatment to each holder of an Asbestos Claim or Demand." To satisfy these competing goals, the CRP give the trustees plenary power and discretion not only to "determine the Payment Sum Percentage of the Allowed Liquidated Value that will be paid to holders of Allowed Asbestos Claims," but also "to alter the Payment Sum Percentage, the timing, method, and sequencing of payments to holders of Allowed Asbestos Claims, the Asbestos-Related Disease Categories and the Criteria, as well as the power to increase the Allowed Liquidated Value for any Asbestos-Related Disease Category."

The CRP further provide that the amount the Trust is obligated to pay to a claimant holding an allowed asbestos claim varies depending on whether the claimant selects a discounted cash payment or individualized review of the claim. A claimant electing to receive an expeditious, discounted lump-sum payment receives $800. A claimant electing individualized review is entitled to "have his or her Asbestos Claim reviewed, based upon an examination of exposure to asbestos-containing materials sold, installed, or removed by Fuller-Austin, loss, damages, injury causation and other factors determinative of claim value according to applicable tort law, subject to the limitations contained herein." Depending on the type of satisfactory evidence provided by the claimant, the claim is then assigned an ALV ranging from $5,500 to $58,500. The ALV, however, is not the amount that the claimant receives. Rather, according to the CRP, "[i]ndividualized review is intended to result in payments equal to the Allowed Liquidated Value for each claim times the then applicable Payment Sum Percentage, subject to the Trustees' power to change such Payment Sum Percentage as set forth herein."

Appellants' insurance policies indemnify Fuller-Austin for amounts it is "obligated to pay" by law. The CRP establish that the only amount that Fuller-Austin is obligated to pay is each claim's payment sum percentage—not its ALV. (See *In re Mid-Valley, Inc., supra,* 305 B.R. at p. 431 ["The fact that Debtors agree to pay asbestos claimants a certain amount does not mean that the insurers are bound to pay that same amount. The certain insurers' obligation to pay will be determined in coverage litigation"].) The ALV serves only as a model of what would be paid under the best case scenario, assuming that the payment sum percentage reached 100 percent. While premising appellants' indemnity obligations on the basis of a best case scenario may comport with a strong public policy to compensate victims of asbestos exposure, public policy may not be used to redefine the scope of coverage. (*Ward General Ins. Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 553 [7 Cal.Rptr.3d 844]; see *AIU Ins. Co. v. Superior Court, supra,* 51 Cal.3d at p. 818 ["The answer [to coverage determinations] is to be found solely in the language of the policies, not in public policy considerations"].) The CRP establish that the ALV does not reflect Fuller-Austin's legal obligation to each claimant and therefore cannot be used as the basis for fixing appellants' indemnity obligations.

In large part, the trial court relied on public policy considerations to reach a contrary result. It stated that "the fundamental purposes of the bankruptcy or insolvency provisions of their policies would be thwarted if insurance companies were allowed to escape responsibility based on an insolvent policyholder's inability to pay." But requiring appellants to indemnify Fuller-Austin for amounts it pays to claimants satisfies their responsibility and is consistent with California law and policy requiring that "the insolvency or bankruptcy of the insured will not release the insurer from the

payment of damages for injury sustained or loss occasioned during the life of such policy." (Ins. Code, § 11580, subd. (b)(1).) As stated in one of the cases cited by the trial court: Insurance Code section 11580 "is a part of every policy and creates a contractual relation which inures to the benefit of any and every person who might be negligently injured by the insured as completely as if such injured person had been specifically named in the policy. [Citations.] The primary purpose of the statute is to protect an injured person when the insured is bankrupt or insolvent." (*Johnson v. Holmes Tuttle Lincoln-Merc.* (1958) 160 Cal.App.2d 290, 298 [325 P.2d 193].)

Here, each asbestos claimant is protected by requiring appellants to indemnify Fuller-Austin in accordance with their policies. Notably, an asbestos claimant would not receive any greater protection by an order requiring appellants to indemnify Fuller-Austin in the ALV amount of each claim, as such payment would not alter the Plan's payment provisions dictating that each claimant receives only a payment sum percentage of the ALV. Moreover, there is no assurance in the Plan—and no requirement in the CRP—that the trustees would upwardly adjust the payment sum percentage on the basis of the Trust's increased assets provided by the insurance proceeds. Rather, the Plan expressly allows excess Trust assets to be used both for trust expenses and charitable purposes.

The trial court, as well as Fuller-Austin, relied heavily on *Webster v. Superior Court* (1988) 46 Cal.3d 338 [250 Cal.Rptr. 268, 758 P.2d 596], for the proposition that an insurer should not be permitted to limit its liability on the basis of its insolvent insured's ability to pay. *Webster*, however, involved the distinctly different question of whether a personal injury plaintiff should be permitted to proceed with his superior court action against an insolvent insurer (Enterprise), which would permit him to seek recovery from Enterprise's liability insurers, or whether he was limited to a statutory claims proceeding against Enterprise. (*Id.* at pp. 341, 343–344.) In the context of that dispute, the court explained that limiting the plaintiff to the claims procedure could result in a "windfall" to Enterprise's insurers as a result of its insolvency because "[c]laims in bankruptcy and insolvency proceedings, however, are often reduced to a small fraction of their true value, perhaps only pennies on the dollar. . . . [T]hose insurers would avoid paying damages to the extent [the plaintiff] receives less in the statutory claims proceeding than he would in an ordinary civil action." (*Id.* at pp. 347–348, fn. omitted.) Here, in contrast, each asbestos claimant will receive the same amount regardless of whether appellants are obligated to indemnify Fuller-Austin in the ALV amount or the payment sum percentage amount. The concerns expressed in *Webster* are not present here.

The trial court also relied on Plan language (without quoting it) purportedly indicating that the ALV of each claim is the amount of Fuller-Austin's

legal obligation. As indicated earlier, however, we read the Plan as expressly and unambiguously permitting the Trust's obligations to be satisfied by payment of the payment sum percentage. Conversely, in certain circumstances Fuller-Austin's legal obligation may exceed the ALV. The CRP provide that a claimant who disputes that his or her claim is satisfied by the payment sum percentage may seek either arbitration or a jury trial, and that the ALV is not binding under those circumstances. Accordingly, we do not read the Plan and its CRP as providing that Fuller-Austin's legal obligation to each claimant is the ALV amount.[14] (See, e.g., *Williams v. American Cas. Co.* (1971) 6 Cal.3d 266, 271 [98 Cal.Rptr. 814, 491 P.2d 398] [" 'an appellate court is not bound by the findings of the trial court [but] [o]n the contrary, it is the duty of the appellate court . . . to make its own independent determination of the meaning of the language used in the instrument under consideration' "].)

Finally, although the trial court did not cite *UNR Industries, supra,* 942 F.2d 1101, in support of its ALV determination, Fuller-Austin contends that *UNR Industries* provides ample support for the trial court's determination. There, the appellate court reversed the district court's determination that the amount of UNR's indemnifiable loss was the amount it would actually pay to asbestos victims with valid claims, explaining that: "[T]his approach threatens to confer a windfall on CNA at the asbestos victims' expense. [¶] The reason for the potential windfall is that UNR paid the Trust only a portion of the asbestos victims' actual damages in the bankruptcy proceedings. This discounting of the asbestos victims' damages had nothing to do with the merits of their claims. The discounting merely reflected the amount of UNR's assets that the asbestos victims could reach. CNA may profit greatly from UNR's bankruptcy if its obligations are based on the arbitrarily discounted amount that the asbestos victims actually receive from the Trust." (*Id.* at p. 1105.)

Implicit in the *UNR Industries* court's reasoning is the notion that there is a direct relationship between the amount that CNA pays into the trust and the amount that each asbestos victim will receive. As discussed earlier, however, the Plan here makes no provision for such a relationship. In other words, nothing in the Plan states that the payment sum percentage received by each asbestos claimant is directly affected by the level at which insurance proceeds are recovered. While certainly there may be some indirect effect to the extent that the payment sum percentage can change on the basis of total Trust assets, such a tenuous relationship affords no basis for imposing an indemnification obligation on appellants in the ALV amount. We therefore decline to follow

[14] Nor do we find that the principles governing reinsurance have any applicability to these circumstances. Rather, the relationship between an insurer and a reinsurer is governed by the particular terms of their contract, which generally do not permit the reinsurer to pay an amount less than the insured's claim because of the insurer's insolvency. (E.g., *Allemannia Ins. Co. v. Firemen's Ins. Co.* (1908) 209 U.S. 326, 331 [52 L.Ed. 815, 28 S.Ct. 544]; *Koken v. Reliance Ins. Co.* (Pa. Cmwlth. Ct. 2004) 846 A.2d 167, 171.)

*UNR Industries* on this point. Appellants are not required to indemnify Fuller-Austin in the ALV amount of each claim; their obligation is to indemnify Fuller-Austin for the amount the Plan obligates it to pay for each allowed claim.

### E. *Summary of Phase IB Rulings.*

 We reverse the phase IB statement of decision to the extent it determined that appellants had waived all rights under their policies to object to the reasonableness of the settlement afforded by the bankruptcy confirmation, that the jury was entitled to make a binding determination as to the aggregate value of all present and future asbestos claims, and that the ALV amount of each claim would be binding on appellants. On remand, appellants will be entitled to assert that the Plan is unfair, unreasonable or the product of fraud or collusion as defenses to Fuller-Austin's breach of contract and declaratory relief action. Because we have found the bankruptcy settlement to be valid as between Fuller-Austin and the asbestos claimants, as well as to appellants, subject to their limited ability to challenge the settlement as it relates to their obligations, the Trust's evaluation and resolution of each claim will suffice as a determination of Fuller-Austin's liability on each claim. Appellants retain their prebankruptcy rights under the policies to raise defenses to coverage as to each claim for which liability has been established. (E.g., *In re Combustion Engineering, Inc., supra,* 391 F.2d at pp. 217–218; *In re Western Asbestos Co., supra,* 313 B.R. at p. 462; *In re Mid-Valley, Inc., supra,* 305 B.R. at p. 432.)

Our conclusion that appellants' indemnity obligations have not yet been fixed does not preclude Fuller-Austin from pursuing its action against appellants. (*Earth Elements, Inc. v. National American Ins. Co.* (1995) 41 Cal.App.4th 110, 116–117 [48 Cal.Rptr.2d 399] ["The insured may sue to enforce the insurer's duty to defend and indemnify without a final judgment being entered in the underlying third party action"].) Once raised and determined in this action, any findings on the issues of the Plan's fairness, reasonableness and fraud or collusion will be binding on all asbestos claims tendered to appellants under their policies. (See, e.g., *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1078 [6 Cal.Rptr.3d 813] [collateral estoppel requirements]; *County of Los Angeles v. County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102, 108 [16 Cal.Rptr.2d 479] [same].)

### III. *The Jury Trial.*

While appellants First State, CNA and International settled with Fuller-Austin following phase IB, appellants LMI and Stonewall proceeded to

a jury trial phase on Fuller-Austin's breach of contract claims. Our conclusion that the trial court erred in permitting the jury to calculate an aggregate value of all present and potential asbestos claims—coupled with our conclusion that the ALV is not the appropriate indemnification amount—necessarily requires reversal of the jury's damages findings. Specifically, the judgment must be reversed as to special verdict question Nos. 11 through 21, and with respect to the trial court's damages findings stemming from the jury's responses to those questions.

Appellants LMI and Stonewall—as well as appellant CNA, which did not participate in the jury trial phase—contend that the jury's liability findings must also be reversed by reason of two prejudicial instructional errors: (1) The trial court instructed the jury that present and future asbestos claims were presumed to be harm within the policies' coverage—in effect, shifting the burden of establishing noncoverage of those claims to appellants; and (2) it instructed the jury that the bankruptcy court had found the settlement to be reasonable, thereby removing the issue of reasonableness from the jury's purview.

We agree with appellants that the instruction concerning the presumption of harm within coverage was erroneous and misstated the law. We further conclude that reversal of the jury's liability findings is warranted because it is reasonably probable that the presumption of harm instruction affected the verdict. (See, e.g., *Soule v. General Motors Corp.*(1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) The reasonableness instruction was not erroneous in the context of the other instructions. However, because the special verdict form did not permit the jury to make any finding on the central issue of reasonableness, the jury's liability findings must be reversed for this reason as well.

### A. *The Trial Court Erroneously and Prejudicially Instructed the Jury That the Asbestos Claims Were Presumed to be Harm Within Coverage.*

As part of the phase IB statement of decision, the trial court ruled: "The asbestos liabilities adjudicated in the bankruptcy are presumed to be harm within coverage. *Armstrong* [*World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996)] 45 Cal.App.4th [1,] 85, 52 Cal.Rptr.2d 690 [(*Armstrong*)]. It is Joint Defendants' burden at trial to prove otherwise." Consistent with that ruling, the trial court instructed the jury: "The Court has determined that the asbestos bodily injury claims resolved in the bankruptcy proceedings are presumed to be harm within the coverage provided by the insurance policies issued by the insurance companies in this action. What this means is that the bodily injury claims resolved in the bankruptcy are presumed to arise from

exposure to Fuller-Austin products before or during the insurance companies' policy periods. Defendants have the burden of proving otherwise." Appellants objected to this instruction.

■ This instruction is directly contrary to the well-established principle that "[t]he burden is on an insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage." (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1188 [77 Cal.Rptr.2d 537, 959 P.2d 1213]; accord, *Weil v. Federal Kemper Life Assurance Co.* (1994) 7 Cal.4th 125, 148 [27 Cal.Rptr.2d 316, 866 P.2d 774]; *Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 437–438 [212 Cal.Rptr. 466, 696 P.2d 1308]; *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 758 [15 Cal.Rptr.2d 815].) This inveterate authority demonstrates that the initial burden of establishing harm within coverage falls on the insured, not the insurer.

The trial court misread *Armstrong* to impose the burden of establishing coverage on appellants. The page of the *Armstrong* decision cited by the trial court discusses the exception articulated in *Isaacson v. California Ins. Guarantee Assn., supra,* 44 Cal.3d 775 to the "general rule placing the burden on the policyholder to establish facts to trigger coverage . . . ." (*Armstrong, supra,* 45 Cal.App.4th at p. 85.) The exception is implicated by an insurer's erroneous denial of coverage, erroneous refusal to defend or refusal to accept a reasonable settlement: "In such a case, the insured has the burden of showing the settlement was reasonable and if it meets that burden, then again the act of settlement raises two presumptions: that the claim was legitimate and that the amount of the settlement was the amount of the insured's liability. [Citation.]" (*Ibid.*) Stated another way, when an insurer refuses to accept a settlement that the insured proves was reasonable, "then the insured is entitled to a presumption in his favor—a presumption that the insured is indeed liable to the claimant and that the amount of his liability is the amount of the settlement." (*Ibid.*)

The presumption derived from *Armstrong*, thus, involves the extent of the insured's liability; that is, an insured is relieved from the burden of establishing both the fact and amount of its liability where the insurer has failed to accept a reasonable settlement. But whether an insured is liable to the claimant is a distinctly different issue from whether such liability amounts to a covered claim. *Armstrong* did not hold that an insured is entitled to a presumption that such liability falls within coverage under any circumstances. Instructing the jury that the asbestos claims against Fuller-Austin were presumed to be harm within coverage plainly misstated the law and erroneously shifted the burden to appellants to disprove a critical element of Fuller-Austin's claim against appellants. (See *Buzgheia v. Leasco Sierra Grove*

(1997) 60 Cal.App.4th 374, 393 [70 Cal.Rptr.2d 427] [instructing that the wrong party has the burden of proof on a dispositive issue "is a major instructional error"].)

 This instruction was prejudicial because it likely misled the jury. " 'Article VI, section 13 of the California Constitution provides that error in instructing the jury shall be grounds for reversal only when the reviewing court, "after an examination of the entire cause, including the evidence," concludes that the error "has resulted in a miscarriage of justice." The test of reversible error has been stated in terms of the likelihood that the improper instruction misled the jury. [Citation.]' [Citations.] Thus, if a review of the entire record demonstrates that the improper instruction was so likely to have misled the jury as to become a factor in the verdict, it is prejudicial and a ground for reversal. [Citation.]" (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 703–704 [17 Cal.Rptr.3d 397]; see also *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203] [no inherent prejudice from erroneous burden-shifting instruction].) To measure the likelihood of whether the jury was misled, "we must evaluate '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' " (*Buzgheia v. Leasco Sierra Grove, supra,* 60 Cal.App.4th at pp. 393–394, quoting *Soule v. General Motors Corp., supra,* 8 Cal.4th at pp. 580–581, fn. omitted.)

Considering these factors in order, there was essentially no evidence that the asbestos claims satisfied the policies' indemnity provisions requiring injury resulting from exposure to Fuller-Austin's asbestos-containing products. Rather, the testimony and documentary evidence concerning the existence of asbestos claims focused on their timing, volume and procedural treatment by the Trust. Evidence that these claims resulted from Fuller-Austin products was based primarily on testimony that relied on statistical probabilities of exposure and resulting injury. For example, one liability assessment expert testified: "When we do our analysis we look at the sum total of the individual's exposure to asbestos, whether it be purely Fuller-Austin's asbestos or someone else's asbestos. [¶] . . . [The models] are based on the full duration of asbestos, not exposure to a particular company's product." No evidence was offered linking these claims to Fuller-Austin's specific products. But the erroneous instruction to presume coverage likely misled the jury into believing that such evidence was unnecessary for Fuller-Austin to meet its burden. (See *Huffman v. Interstate Brands Corp., supra,* 121 Cal.App.4th at p. 704; see also *Rancho Santa Fe Pharmacy, Inc. v. Seyfert* (1990) 219 Cal.App.3d 875, 880 [268 Cal.Rptr. 505] [" ' "Burden of proof" means the obligation of a party to establish by evidence a *requisite degree of belief* concerning a fact in the mind of the trier of fact or the court.' . . . . [¶] . . . The

party having the burden of proof must offer evidence so that the trier may have a basis for finding in his favor"].)

No other instructions cured the error in the presumption of coverage instruction. Rather, other instructions reinforced the error by informing the jury that a presumption arises where the court instructs that it exists and "[i]f a presumption arises, the party opposing the presumption then has the burden to overcome it by a preponderance of the evidence." Likewise, in closing argument Fuller-Austin's counsel focused the jury on the erroneous instruction, stating: "[T]he court told you yesterday the court has determined that the asbestos bodily injury claims resolved in the bankruptcy proceedings are presumed to be harm within the coverage provided by the insurance policies issued by the insurance companies in this action. [¶] What that means is that the bodily injury claims resolved in the bankruptcy are presumed to arise from exposure to Fuller-Austin products before or during the insurance company's [*sic*] policy periods. [¶] The defendants have the burden of proving otherwise." (See *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1070 [232 Cal.Rptr. 528, 728 P.2d 1163] [in assessing prejudice, court considers " 'whether respondent's argument to the jury may have contributed to the instruction's misleading effect' "].) Finally, questions from the jury suggest that it moved quickly past the issue of coverage, as the jury's first question was a request to have copies of reports estimating the number of future asbestos claims to be filed.

On the basis of the foregoing factors, it is reasonably probable that a result more favorable to appellants would have been reached had the jury been properly instructed that Fuller-Austin bore the burden of showing coverage. Instructing the jury that the asbestos claims were presumed to be harm within coverage was prejudicial error.

> B. *The Trial Court Did Not Err in Instructing the Jury on the Reasonableness of the ALV Amount, but It Erroneously and Prejudicially Precluded the Jury from Reaching a Verdict on the Issue of the Bankruptcy Plan's Reasonableness.*

In connection with informing the jury of the ALV amounts determined by the bankruptcy court, the trial court instructed: "The Bankruptcy Court further determined that these amounts are reasonable, were negotiated in good faith among the parties to the bankruptcy, and constitute a binding liability of Fuller-Austin to the asbestos claimants." Appellants objected to this instruction.

Appellants contend that this instruction was prejudicially misleading— conveying the impression that the bankruptcy court had already conclusively

determined the issue of reasonableness. The instruction, however, was far too limited to have had such an impact. Rather, the instruction expressly limited the issue of reasonableness to the ALV amounts. Moreover, other instructions correctly informed the jury of the limited effect of the bankruptcy court findings. For example, the trial court instructed: "The insurers in this case were not parties to those bankruptcy proceedings. . . . Because these insurers were not parties to the bankruptcy proceedings, the Bankruptcy Court made no findings and determinations relating to them." It also gave an instruction concerning the factors the jury may consider in determining whether a settlement opportunity was reasonable. " 'The instructions must be considered in their entirety, and if, as so considered, they state the law of the case fairly and clearly, then they are, as a whole, unobjectionable, even though by selecting isolated passages from single instructions they may in some respects be amenable to just criticism.' [Citations.]" (*Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 464 [136 Cal.Rptr. 653].) When considered as a whole, the instructions did not convey the misleading impression that the issue of reasonableness had already been determined.

■ But despite instructions asking the jury to consider the issue of the settlement's reasonableness, *the special verdict did not require the jury to make any finding on the issue of reasonableness.* This omission is significant because a special verdict "requires the jury to resolve all of the controverted issues in the case, unlike a general verdict which merely implies findings on all issues in one party's favor." (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678 [24 Cal.Rptr.3d 338].) Appellants requested that the special verdict form include a separate finding as to whether the bankruptcy settlement was reasonable. (See *Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 47, fn. 3 [21 Cal.Rptr.2d 110] [appellant must object to or otherwise challenge special verdict form in the trial court to allege error on appeal].) Fuller-Austin objected, and the trial court refused to include a special verdict question concerning reasonableness.

As discussed in part II.B.2., *ante*, an excess insurer that does not participate in a settlement need not indemnify an unreasonable or collusive settlement, and thus is entitled to challenge the settlement on the grounds of unreasonableness or collusion. (*Diamond Heights, supra,* 227 Cal.App.3d at p. 582; see also 14 Couch on Insurance, *supra,* § 199:48, p. 199-92.) Here, the jury was asked to find whether the Plan was the product of unclean hands or collusion. Consistent with the law, the jury was instructed that Fuller-Austin was guilty of unclean hands if it committed misconduct that violated conscience or good faith. (E.g., *Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979 [90 Cal.Rptr.2d 743].) Unclean hands, however, is not the equivalent of unreasonableness.

Thus, the jury's finding that Fuller-Austin was not guilty of inequitable misconduct did not answer the distinctly different question of whether the Plan was unreasonable. (See *Isaacson v. California Ins. Guarantee Assn., supra,* 44 Cal.3d at pp. 792–793 [addressing insured's need to show reasonableness of settlement before recovering from insurer].) As explained in *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949 [17 Cal.Rptr.2d 242]: " 'Unlike a general verdict (which merely *implies* findings on all issues in favor of the plaintiff or defendant), a special verdict presents to the jury each ultimate fact in the case. The jury must resolve all of the ultimate facts presented to it in the special verdict, so that "nothing shall remain to the court but to draw from them conclusions of law." [Citation.] [¶] The requirement that the jury must resolve every controverted issue is one of the recognized pitfalls of special verdicts.' " (*Id.* at pp. 959–960; accord, *City of San Diego v. D.R. Horton San Diego Holding Co., Inc., supra,* 126 Cal.App.4th at pp. 678–679; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 285 [73 Cal.Rptr.2d 596]; *Falls v. Superior Court* (1987) 194 Cal.App.3d 851, 854–855 [239 Cal.Rptr. 862].)

The special verdict here did not permit the jury to resolve the controverted issue of the Plan's reasonableness. As such, it was fatally defective and affords an additional basis for reversal of the jury's liability findings.

IV. *LMI's and Stonewall's Challenges to the Judgment.*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed to the extent it imposes liability on appellants, to the extent it requires appellants to pay an aggregate sum for present and potential future asbestos claims against Fuller-Austin, and to the extent that any indemnification was calculated on the basis of the ALV amount of any claim. More specifically, the phase IB statement of decision, incorporated as part of the judgment, is reversed as to the trial court's rulings on the trigger of coverage on the Cities Service policies (issue No. 9) and the excess policy triggers (issue No. 3), the latter of which encompasses rulings concerning the bankruptcy adjudication as a judgment, the obligation to pay the ALV amount of the claims and the obligation to pay an aggregate sum for present and potential future claims. The special verdict, also incorporated as part of the judgment, is reversed as to questions 2, 3 and 4 (as to the Cities Service coverage only), 5, 6, 9 through 17, 19 and 20. The judgment's damages

---

\*See footnote, *ante,* page 958.

calculations premised on those special verdict questions are also reversed. In all other respects, the judgment is affirmed. The matter is remanded for retrial in accordance with the views expressed herein. Appellants to recover their costs on appeal.

Boren, P. J., and Ashmann-Gerst, J., concurred.

A petition for a rehearing was denied February 17, 2006, and the nonpublished portion of the opinion was modified. Respondent's petition for review by the Supreme Court was denied April 19, 2006, S141462.